CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND, Chicago District Council of Carpenters Welfare Fund, and the Chicago and Northeast Illinois District Council of Carpenters Apprentice and Trainee Program, Plaintiffs,

v.

VACALA MASONRY, INC., and Vacala Construction, Defendants.

No. 95 C 1293.

United States District Court, N.D. Illinois, Eastern Division.

Dec. 3, 1996.

Terrence P. Canade, Brian T. Garelli, Margaret A. Scott, Lord, Bissell & Brook, Chicago, IL, for Plaintiffs.

Robert P. Casey, Dwight D. Pancottine, Peter A. Steinmeyer, Murphy, Smith & Polk, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

ASHMAN, United States Magistrate Judge.

On March 2, 1995, Plaintiffs, Chicago District Council of Carpenters Pension Fund, Chicago District Council of Carpenters Welfare Fund, and the Chicago and Northeast Illinois District Council of Carpenters Apprentice and Trainee Program ("the Funds"), filed their complaint alleging that Defendants, Vacala Masonry, Inc ("VMI") and Vacala Construction, Inc. ("VCI"), breached a collective bargaining agreement signed by VMI as a result of the companies' failure to make monetary contributions to the Funds for each hour worked by VMI's and VCI's carpenter employees and its non-union subcontractors and for refusing to allow the Funds access to VCI's books to verify its compliance with the terms of the agreement. The Funds effectively allege that VCI is the "alter ego" of VMI and is thus bound by the terms of VMI's collective bargaining agreement. Defendants move for summary judgment based on their contention that VCI is not, as a matter of law, the alter ego of VMI.

The parties have consented in writing to the jurisdiction of this Court.

## I. *Facts*

The collective bargaining agreement at issue in this case prohibits employers from subcontracting jurisdictional work to non-union subcontractors. (Funds' 12(N) Statement, ¶ 5). If an employer hires a non-union subcontractor to perform jurisdictional work, the employer must either (1) require the subcontractor to be bound by the terms of the agreement or (2) assume responsibility for reporting the hours worked by the subcontractor's carpenters and for paying contributions to the Funds based on those hours. (Funds' 12(N) Statement, ¶ 5). If VCI is the alter ego of VMI, it would be subject to the terms of the collective bargaining agreement, and would thus owe the Funds money for contributions it would have been obligated to make under the terms of that agreement for nonunion employees who performed work within the scope of the union's jurisdiction. Additionally, VCI would be obligated to allow the Funds to audit its books as part of the Funds' periodic audits.

VCI and VMI are owned by Pat and Chuck Vacala.[1] (Defendants' 12(M) Statement, ¶¶ 12–13, 20–22, 30; Funds' Response to Defendants' 12(M) Statement ("Funds' Response"), ¶¶ 12–13, 20–22, 30). Pat is the sole shareholder and President of VCI while Chuck and Pat are the majority shareholders[2] of VMI. VCI was incorporated in 1980 and has operated as a general contractor at all relevant times. (Defendants' 12(M) Statement, ¶¶ 12, 14–15, Funds' Response, ¶¶ 12, 14–15). VCI has never been a signatory to any union agreements and has never executed any agreement with the Carpenter's Union. (Defendants' 12(M) Statement, ¶ 17; Funds' Response, ¶ 17).

Until recently, Chuck Vacala was VMI's President and Pat Vacala was VMI's secre-

---

**1.** Pat and Chuck are two of the eight Vacala brothers. (Defendants' 12(M) Statement, ¶¶ 8–10). All of the Vacala brothers grew up working in the construction industry and at one time or another, all of them have worked for VCI. (Defendants' 12(M) Statement, ¶¶ 9–12).

**2.** Each owns 49% of VMI's stock, with their brother, Vince, owning the remaining 2% of the stock. (Defendants' 12(M) Statement, ¶ 30).

tary.[3] (Defendants' 12(M) Statement, ¶ 22; Funds' Response, ¶ 22). As VMI's president, Chuck Vacala was responsible for the day-to-day running of VMI, including bidding on, obtaining, scheduling, and overseeing jobs and all hiring and firing. (Defendants' 12(M) Statement, ¶ 24; Funds' Response, ¶ 24). Pat Vacala's involvement with VMI's operations was limited to signing checks and other papers when Chuck was not available, providing general business advice when asked and meeting with Chuck on a monthly basis to review the financial performance of VMI. (Defendants' 12(M) Statement, ¶¶ 27–29; Funds' Response, ¶¶ 27–29).

Chuck Vacala worked for VCI from its inception until 1990, when he broke off to form his own company, VMI, to perform work as a masonry subcontractor. (Defendants' 12(M) Statement, ¶¶ 2, 12, 20; Funds' Response, ¶¶ 2, 12, 20). Although Pat helped Chuck form VMI, Chuck ultimately intended to buy out his brother's interest. (Defendants' 12(M) Statement; ¶ 21; Funds' Response, ¶ 21). Chuck ran VMI out of his house and from the field until 1995, when VMI acquired its own formal office space by renting space from Pat. (Defendants' 12(M) Statement; ¶ 31; Funds' Response, ¶ 31). During the time VMI was being run out of Chuck's home and thereafter, VCI's office staff helped VMI with its paper work and billed VMI for any time thus spent. (Defendants' 12(M) Statement, ¶¶ 58–60, 64; Funds' Response, ¶¶ 58–60, 64).

VMI has been a signatory to agreements with the Laborer's and Bricklayer's Unions from its incorporation, but did not become signatory to the agreement with the Carpenter's Union at issue in this case until October of 1993. (Defendants' 12(M) Statement, ¶¶ 2–3, 23, 36; Funds' Response, ¶¶ 2–3, 23, 36). VMI became signatory to the Carpenter's Union agreement in an effort to assist one of VCI employee's, Dean Pfaff. (Defendants' 12(M) Statement, ¶ 42; Funds' Response, ¶ 42). Pfaff, a member of the Carpenter's Union, was hired by VCI in early 1993. (Defendants' 12(M) Statement, ¶ 38;

Funds' Response, ¶ 38). Pfaff knew that VCI was not a signatory to the Carpenter's Union agreement when he began to work for VCI; however, at some point, he expressed concern about losing his union benefits. (Defendants' 12(M) Statement, ¶ 39; Funds' Response, ¶ 39).

Pat and Chuck discussed this problem and came up with a solution that would be beneficial to both VMI and VCI. (Defendants' 12(M) Statement, ¶¶ 40–41; Funds' Response, ¶¶ 40–41). Pursuant to this discussion, VMI became signatory to an agreement with the Carpenter's Union and Pfaff went to work for VMI. (Defendants' 12(M) Statement, ¶ 40; Funds' Response, ¶ 40). VMI also hired additional union carpenters and then leased Pfaff and the others back to VCI on an as needed basis. (Defendants' 12(M) Statement, ¶¶ 40–41; Funds' Response, ¶¶ 40–41). This arrangement enabled Pfaff to retain his benefits and allowed VMI to maintain its own contingent of carpenters, which it could then lease to VCI. (Defendants' 12(M) Statement, ¶¶ 40–41; Funds' Response, ¶¶ 40–41).

Most of the work performed by VMI's carpenters was done under the leasing agreement with VCI. (Funds' 12(N) Statement, ¶ 13; Defendants' Response, ¶ 13). When VMI employees were leased to VCI, they worked under the supervision of VCI superintendents, who directed their work. (Defendants' 12(M) Statement, ¶ 55, Funds' Response, ¶ 55). Additionally, when VCI leased employees from VMI to perform work at construction sites where VCI was the general contractor, VCI occasionally provided tools for the leased employees if needed. (Funds' 12(N) Statement, ¶ 10; Defendants' Response to Funds' 12(N) Statement ("Defendants' Response"), ¶ 10).

Work done for VCI represents a sizable portion of VMI's income. From 1990–1993, approximately 50% of VMI's work was the result of subcontract work done under lease to VCI. (Defendants' 12(M) Statement, ¶ 77; Funds' Response, ¶ 77). In 1994, VMI completed four jobs worth approximately $680,-

**3.** Chuck Vacala was relieved of his duties as President of VMI in February of 1996 due to personal problems and was replaced by J. Ben-

nett, who still currently holds that position, while Chuck remains on as VMI's Secretary. (Defendants' 12(M) Statement, ¶ 25).

000, three of which were jobs where VCI was the general contractor. (Defendants' 12(M) Statement, ¶ 78; Funds' Response, ¶ 78). Through October 31, 1995, VMI had completed 18 jobs totalling approximately $524,000, with VCI the general contractor on 7 of the 18 jobs. (Defendants' 12(M) Statement, ¶ 79; Funds' Response, ¶ 79). However, VCI was the general contractor on all twelve of the jobs in progress as of October 31, 1995. (Funds' 12(N) Statement, ¶ 12; Defendants' Response, ¶ 12). From October 1, 1993 until September 30, 1995, VCI paid VMI $758,915.09. (Funds' 12(N) Statement, ¶ 12; Defendants' Response, ¶ 12). During this same period, VCI paid VMI $19,957 for leased non-supervisory employees and $68,645 for leased carpentry employees. (Funds' 12(N) Statement, ¶ 12; Defendants' Response, ¶ 12).

VMI also received monetary advances from VCI, which was the only company to give VMI this type of advance. (Funds' 12(N) Statement, ¶ 19; Defendants' Response, ¶ 19). Other general contractors paid VMI only after the general contractor itself was paid. (Funds' 12(N) Statement, ¶ 19; Defendants' Response, ¶ 19). However, any advances VCI made to VMI were always repaid. (Defendants' 12(M) Statement, ¶ 72; Funds' Response, ¶ 72).

Whenever VMI leased employees to VCI, VMI paid the required contributions to the Carpenter's Union fringe benefit funds for all hours worked by those employees while leased to VCI. (Defendants' 12(M) Statement, ¶ 54; Funds' Response, ¶ 54). However, Plaintiffs contend that Defendants owe them $107,937.67 in unpaid contributions.[4] (Funds' 12(N) Statement, ¶ 7). This breaks down to $105,424.50 in contributions Plaintiffs claim VCI, if found to be VMI's alter ego, would owe for jurisdictional work performed by non-union individuals and subcontractors employed by VCI and $2,512.33 in contributions Plaintiffs claim VMI owes for allegedly under-reporting hours worked by

two of its own employees in October, November and December of 1993. (Funds' 12(N) Statement, ¶¶ 7–8; Funds' Response, ¶ 49).

## II. Standard for Summary Judgment

Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In ascertaining whether summary judgment is appropriate, the Court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); *Kennedy v. United States,* 965 F.2d 413, 417 (7th Cir.1992). Summary Judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552. Consequently, motions for summary judgement must be analyzed in light of both the applicable substantive law and the question of whether a reasonable jury could return a verdict in the non-movant's favor. *Checkers, Simon & Rosner v. Lurie Corp.,* 864 F.2d 1338, 1344 (7th Cir.1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-movant party, there is no genuine issue for trial" and summary judgment must be granted. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## III. Analysis

Defendants advance two arguments in support of their motion for summary judgment:

---

4. This Court notes that the affidavit supporting these statements was one of the subjects of the Defendants' motion to strike, based on Defendants' contention that the audit report referred to in the affiant's statement is hearsay, conclusory in nature and that the affidavit reflects the opinion of the affiant about the existence of delin-

quencies but is not proof thereof. The Court need not address each of the contentions raised by the Defendant's motion to strike; it is sufficient to note that the Court has relied only upon relevant, admissible evidence in reaching its opinion in this case.

(A) that VMI possesses no unlawful motive or intent to avoid its collective bargaining agreement obligations; and (B) that analysis of the remaining alter-ego factors establishes that VCI is not the alter-ego of VMI. The Court finds the first argument dispositive of this motion. However, for completeness, the Court will also address the Defendants' second argument.

## A. The Unlawful Motive Requirement

Defendants contend that VMI had no unlawful motive or intent to avoid the terms of its collective bargaining agreement. Defendants assert that the starting point in this analysis is October 1, 1993. Prior to this date, Defendants were not signatories to any agreement with the carpenter's union. Defendants claim that VMI's actions on and after this date, namely, joining the carpenter's union and having VCI employees who were members of the carpenter's union become VMI employees who were then leased back to VCI, is not evidence of intent to avoid the terms of a bargaining agreement because there was no preexisting agreement to be avoided.

Furthermore, Defendants contend that their actions, contrary to avoiding the terms of any bargaining agreement, resulted in VMI assuming obligations it did not previously have. By signing up with the union, VMI became liable for making contributions to the Fund, an action which benefitted the Funds by giving them contributions they otherwise would not have had. Defendants claim this result is the antithesis of the unlawful motive or intent necessary to an alter-ego finding. Finally, Defendants contend there must be some evidence that the lease agreements between VCI and VMI helped VMI, the signatory company, evade its union obligations. Defendants allege that VMI has complied with its union obligations, paying contributions for the hours worked by its carpenters, including hours those employees worked while leased to VCI.

■ The Plaintiffs' contention that VCI is the alter ego of VMI and thus, should be held liable for its failure to comply with the terms of VMI's collective bargaining agreement forms the gravamen of Plaintiffs' claim. Un-

der the alter-ego doctrine, two nominally distinct employers will be deemed a single entity to " 'prevent[ ] an Employer from gaining an unearned advantage in his labor activities simply by altering his corporate form.' " *Central States, Southeast and Southwest Areas Pension Fund v. Sloan*, 902 F.2d 593, 596 (7th Cir.1990) (citations omitted).

■ The alter-ego analysis is very fact intensive and centers around several factors which involve whether the two enterprises share "substantially identical: (1) management; (2) business purposes; (3) operations; (4) equipment; (5) customers; (6) supervision; and (7) ownership." *Board of Trustees of Chicago Plastering Institute Pension Trust Fund v. William A. Duguid Co.*, 761 F.Supp. 1345, 1348 (N.D.Ill.1991). No one factor is determinative of the issue and thus, alter-ego status may be established where one or more of the elements is missing. *Trustees of Pension, Welfare, and Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co., Inc.*, 995 F.2d 785, 789 (7th Cir.1993). However, what is essential to a finding of alter-ego status is " 'the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through the sham transfer of assets. In sum, unlawful motive or intent are critical inquiries in an alter-ego analysis....' " *Favia*, 995 F.2d at 789. (citations omitted).

■ Since intent to avoid the obligations of a collective bargaining agreement is critical to the alter ego analysis, the Court begins with this factor. After considering the evidence submitted by the parties on Defendants' intent, the Court finds that the Defendants' lacked the unlawful intent necessary to find VCI the alter-ego of VMI.

On the issue of Defendants' intent, Plaintiffs argue that VCI's relationship with VMI has enabled VCI to employ union carpenters without having to sign the collective bargaining agreement. The Funds argue that VCI, acting on its own, would have had difficulty attracting and retaining union employees because VCI is not signatory to a collective bargaining agreement. Thus, Plaintiffs contend that VCI used its agreement with VMI

to attract skilled carpenters and that VCI exploited its leasing agreement with VMI to give it the appearance of hiring only union carpenters while "filling in the gaps" with non-union carpenters and laborers.

Additionally, Plaintiffs contend that the leasing agreement between VMI and VCI enabled VCI to unilaterally select which union benefits and obligations it would follow. The Funds contend that VCI is now able to avail itself of the benefits of the carpenter's union—skilled tradesman—without the burdens of union membership—audits and paying union wages and benefits for non-union individuals working within the jurisdiction of the carpenter's union collective bargaining agreement.

Finally, Plaintiffs claim that Defendants have attempted to broaden this circuit's definition of intent by arguing that the collective bargaining agreement must exist prior to any fraudulent actions; that intent is limited to that of the signatory company; and that there is no intent where the plaintiff receives contributions it otherwise would not have.

■ While this case obviously does not fit into the typical situation whereby a union company dissolves itself and reemerges as a non-union company in order to circumvent compliance with its obligations under a preexisting collective bargaining agreement, the alter ego doctrine is also applicable in "situations in which the entity exists side-by-side with its alleged alter ego." *Duguid,* 761 F.Supp. at 1348. Consistent with this proposition, the Ninth Circuit stated the "alter ego doctrine is designed to prevent employers from escaping their collective bargaining obligations by shifting work to non-union firms they also own." *UA Local 343 v. Nor–Cal Plumbing, Inc.,* 48 F.3d 1465, 1475 (9th Cir. 1994).

However, both scenarios presume the existence of a collective bargaining agreement that the Defendants are trying to avoid. In the instant case, the Plaintiffs have inferred that VCI has attempted to avoid a collective bargaining agreement by having VMI sign an agreement with the carpenter's union to enable a union employee to receive benefits without VCI having to become signatory to a union agreement. However, the fact that the parties may have intended VCI to benefit from VMI's union agreement cannot, under any recognized or rational legal theory extend the union obligations to VCI. Had the union and VMI intended to extend the agreement to prohibit the kind of leasing that occurred in this case, they could have expressly provided for this in the terms of the collective bargaining agreement itself. Since the union failed to provide such an explicit prohibition, the union cannot now logically argue that the contract should be applied beyond the actual signatory company.

The Court finds that the type of evasion alleged by the Plaintiff is not the type the alter ego doctrine is designed to prevent. Rather, the doctrine is designed to prevent a signatory company from using a non-signatory company to dodge the signatory's obligations under a collective bargaining agreement. Here, Defendants have stood this analysis on its head by arguing that a non-signatory company (VCI) has used a signatory company (VMI) to avoid the obligations of a collective bargaining agreement by avoiding the need to sign a collective bargaining agreement altogether.

While VCI may have intended to avoid signing a collective bargaining agreement, it did not intend to avoid complying with the terms of a collective bargaining agreement it was obligated to follow. The alter ego doctrine was not intended to be used as a means of coercing a non-union company into becoming a union company by requiring it to sign a collective bargaining agreement or by requiring it to comply with the terms of a collective bargaining agreement which it never signed, absent proof that the non-signatory company was being used by the signatory to avoid its collective bargaining agreement obligations. From a public policy standpoint, this Court finds the application of the alter ego doctrine advanced by the Funds patently inequitable and illogical.

Contract law flows from the premise that a party is bound by a contract only when there is an assent and manifestation by that party to be so bound. The alter ego doctrine operates to abrogate that premise when a party which has signed a contract (collective bar-

gaining agreement) fraudulently attempts to avoid its obligations under that contract. Such a deviation from basic contract principles is permitted in order to prevent the injustice that results when a party to a contract is allowed to evade its obligations by, for example, simply going out of business and then reemerging as a different entity with the same business purpose. In such a case, courts apply the alter ego doctrine to hold an entity that was not a party to the contract liable because that entity is being used by the signatory party as a means of avoiding the signatory's obligations. However, this Court finds that the doctrinal underpinnings of contract law should not be set aside to hold an entity which was never a party to a contract liable for avoiding the need to sign the contract in the first place.

In reaching this conclusion, the Court finds Judge Holderman's opinion in *Chicago District Council of Carpenters Pension Fund v. CGI Contracting, Inc.,* 1996 WL 66008 (N.D.Ill.1996), a case cited by neither party, most instructive. The facts of *CGI* are almost identical to the facts in the instant case and thus the rationale applies with equal force to the case at bar.

In *CGI*, the Defendant, Components Group, Inc. was a general contractor which was incorporated by Jerry Shaffer and Wayne Babcock in June of 1985. 1996 WL 66008 at *1. A few months after CGI was incorporated, Babcock and Shaffer's friend, Ira Dorance, who was a carpenter, became interested in working for CGI. *Id.* CGI only performed general contracting work and subcontracted out any carpentry work that was needed. *Id.* To help Dorance, who wanted to keep his union affiliation, Shaffer and Babcock formed CGI Contracting, a carpentry subcontractor, which then hired Dorance as a carpenter. *Id.* CGI Contracting became signatory to a collective bargaining agreement with the carpenter's union and made contributions to the Trust Funds during the relevant period of time. *Id.*

After CGI was forced into bankruptcy in 1991, Shaffer and Babcock incorporated Components and changed CGI Contracting from a partnership to a corporation. *Id.* Components and CGI Contracting entered into an agreement similar to that used by the predecessor companies whereby CGI Contracting would perform the carpentry subcontract work on Components' construction projects. *Id.* CGI Contracting entered into the collective bargaining agreement at issue in the case on November 4, 1991 to enable its current employee to continue his union membership. *Id.*

The Trust Funds filed an action claiming that CGI Contracting and Components breached the collective bargaining agreement by refusing to allow the Trust funds to examine the books and records of Components to determine what amount Components may have been obligated to contribute to the Trust Funds. *Id.* at *2. The Trust Funds did not contest the fact that Components had not signed a collective bargaining agreement. *Id.*

On the issue of intent, defendants stated that it was uncontested that the only reason they started CGI Contracting was to enable a friend to keep his union membership. *Id.* at *3. Conversely, Plaintiffs cite, as evidence of defendant's intent, Shaffer's deposition testimony that CGI Contracting was created to help a union carpenter keep his union affiliation and benefits package while allowing Components to avoid establishing a benefits package of a comparable type. *Id.*

Plaintiffs further argued that the defendants "'fractionalized their business operations in order to employ skilled union carpenters to work exclusively on Components projects and obtain union benefits for those employees, while removing Components from the subcontracting liability and audit requirements imposed by the collective bargaining agreement.'" *Id.* at *4. Furthermore, plaintiffs contended that Components was "unilaterally selecting which benefits it [would] receive and which obligations it [would] follow...." *Id.*

After reviewing these facts, the court in *CGI* concluded

Here, plaintiffs infer from Shaffer's deposition testimony that the defendants attempted to avoid a collective bargaining agreement by having CGI sign a collective bargaining agreement so that a union

member could maintain his integrity with a union, maintain his benefits package, and so that defendants could avoid establishing a benefits package for this employee. Taking plaintiffs argument to its extreme, a company that has not signed a collective bargaining agreement is avoiding a collective bargaining agreement. But based on the cases that the parties have cited, this is not what the alter ego inquiry examines. Rather, courts examine whether a non-signatory is being used to avoid a signatory's obligations under the signatory's collective bargaining agreement. As defendants assert in this case, they could never have tried to remove Components from the scope of a collective bargaining agreement because it was never subject to the terms of that agreement in the first place.

*Id.*

Furthermore, the *CGI* court noted that even though CGI profited by having a benefits package provided for its employee, CGI made contributions to the fund and was bound by its other obligations under the agreement. *Id.* at *5. CGI never picked and chose which obligations it would follow, rather, CGI was obligated to abide by all of the terms of the collective bargaining agreement it signed. *Id.*

The *CGI* court ultimately denied the defendants' motion for summary judgment predicated on its finding that there was a genuine issue of material fact regarding whether Defendants intended to use the non-signatory company to avoid the signatory company's obligations under the collective bargaining agreement. *Id.* This genuine issue of material fact arose from evidence that "Shaffer mislead the auditor during the 1991 audit about the relationship of Components and CGI and that a union [employee] employed by Components performed carpentry work".[5] *Id.*

This Court agrees with the *CGI* court's analysis and finds that the alter ego doctrine

was not meant to be extended to situations such as that presented by this case. While VMI benefitted by having a benefits package provided for its employees and by having a contingent of skilled, union carpenters in its employ, VMI made contributions to the fund and was bound by all of the terms of its agreement. VMI never picked and chose the obligations with which it would comply. As for VCI, VCI quite simply never signed the agreement.

While the *CGI* court denied the defendants' motion for summary judgment, this Court finds the case at bar to be lacking the evidence upon which the *CGI* court predicated its denial. In this case, unlike in *CGI*, there are no allegations that VMI attempted to mislead auditors as to its relationship with VCI or attempted to divert work to VCI to avoid its obligations under the collective bargaining agreement. Viewing the evidence in the light most favorable to the non-moving party, the most that can be said is that VMI may have under-reported the hours of two employees for the first three months after the collective bargaining agreement was signed. However, Plaintiffs admit that, aside from this alleged under-reporting, which amounts to $2,512.33, VMI made all of the required contributions to the funds for all hours worked by VMI employees while leased to VCI. (Defendants' 12(M) Statement, ¶ 54; Funds' Response, ¶ 54).

■ The Court does not find the above evidence sufficient to raise a genuine issue of material fact with respect to Defendant's intent. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-movant party, there is no genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The Court finds the evidence discussed above insufficient to allow a rational trier of fact to conclude that Defendants possessed the unlawful intent necessary to find VCI the alter ego of VMI. However,

---

**5.** An ex-CGI union employee performed carpentry work for and was paid directly by Components. *CGI,* 1996 WL 66008 at *3. Components did not report this employee's hours to the Trust Funds or make contributions to the Trust Funds for hours worked by this employee. (*CGI* Plain-

tiffs' 12(m) Statement, ¶ 32). The court appears to conclude that this fact might be evidence of CGI's use of Components to divert work from CGI to avoid CGI's obligations under the collective bargaining agreement. *Id.* at *5.

Plaintiffs appear to have a claim against VMI for contributions owed as a result of VMI's alleged under-reporting of hours. Consequently, for all of the above reasons, the alter ego theory fails and the Defendants motion for summary judgment is granted, but only as to any claims that the Plaintiffs have against VCI under the alter ego theory, and not as to any claims the Plaintiffs have against VMI for breach of the collective bargaining agreement arising from VMI's alleged under-reporting of hours.

## B. Alter Ego Factors

█ Although the Court has concluded that the Defendants lack the intent requisite to a finding of alter ego status and therefore, can not be held liable under this theory, the Court reviews the remaining alter ego factors for the sake of thoroughness. The Court finds that, based on a review of the remaining factors, there is insufficient evidence to raise a genuine issue of material fact on VCI's alleged alter ego status. The remaining factors include whether the two enterprises share "substantially identical (1) management and supervision; (2) business purposes and customers; (3) operations; (4) equipment; and (5) ownership." *Chicago Plastering Institute Pension Trust Fund v. William A. Duguid Co.*, 761 F.Supp. 1345, 1348 (N.D.Ill.1991).

### 1. *Common Management or Supervision*

█ The determination of whether two theoretically separate entities share common management focuses on common control over hiring and firing employees, as well as other daily management decisions. *NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279 (7th Cir.1989); *Duguid*, 761 F.Supp. at 1351. It is undisputed that Pat has always been in charge of VCI's operations, while Chuck, as VMI's president, has always been in charge of the day to day management of VMI. Although Pat served as secretary of VMI, his involvement was limited primarily to signing checks and other papers when needed and providing general business advice to his brother. Plaintiffs' contend that Pat hired some of VMI's employees. However, the evidence clearly does not support such a

contention. Contrary to Plaintiffs' assertions, Chuck was the only person who made the hiring or firing decisions for VMI.

The only common supervision alleged by the Defendants is that which occurs on job sites where VCI is the general contractor and VMI is a subcontractor. The Court finds that this alleged common supervision is nothing more than the kind of supervision which normally occurs on a construction site when a general contractor is overseeing the work of subcontractors. A review of the supporting evidence reveals that VMI and VCI shared no common management or supervision. The undisputed facts indicate that nothing existed between VCI and VMI beyond the normal subcontracting relationship.

### 2. *Same Business Purposes and Customers*

█ Plaintiffs contend that the two companies have the same business purpose as both are in the construction industry, both employ carpenters and laborers and both work on many similar job sites. Defendants respond that VMI and VCI serve different segments of the construction industry and serve different functions within the industry.

VCI is a general contractor, responsible for overseeing an entire project, while VMI is a subcontractor, only responsible for performing the masonry or carpentry work on a given project. Far from being a distinction without a difference, this distinction in the scope and purpose of VCI's and VMI's work is a critical indication that VMI and VCI serve different purposes and customers. *See Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333, 1337 (9th Cir.1988) (fact that one company builds large block walls for housing tracts and the other builds small block walls for individual private residences supports non-alter ego finding); *Duguid*, 761 F.Supp. at 1353 (fact that one company performs plastering work on large jobs as part of diverse operation while the other performs plastering work as subcontractor on small jobs supports finding that companies do not share the same business purpose). The Court therefore finds no evidence that VMI and VCI share the same business purpose or customers.

### 3. *Identical Business Operations*

The relevant considerations in analyzing this factor are whether one company is financially dependent upon the other, whether they share the same facilities and whether they function jointly on a daily basis. *Central States Pension Fund v. Sloan*, 902 F.2d 593, 597–598 (7th Cir.1990). It is undisputed that VCI is not VMI's only customer. While, from 1990–1993, approximately 50% of VMI's work was the result of subcontract work done under lease to VCI, it is also uncontested that the remaining 50% was work done for other contractors. In 1994, VMI completed four jobs worth approximately $680,000, only three of which were jobs where VCI was the general contractor. Through October 31, 1995, VMI had completed eighteen jobs totalling approximately $524,000, with VCI the general contractor on only seven of the eighteen jobs.

In response, Plaintiffs point out that twelve out of the twelve jobs in progress as of October 31, 1995 were jobs where VCI was the general contractor. From October 1, 1993 until September 30, 1995, VCI paid VMI $758,915.09. During this same period, VCI paid VMI $19,957 for leased non-supervisory employees and $68,645 for leased carpentry employees. Furthermore, Plaintiffs assert that VMI also received monetary advances from VCI, which was the only company to give VMI this type of advance. Other general contractors only paid VMI after the general contractor itself was paid. However, any advances VCI made to VMI were always repaid.

As a second indication of Defendants' identical business operations, Plaintiffs contend that VCI and VMI shared the same office space based on the fact that VMI listed VCI's address and phone number on some documents. However, the Plaintiffs admitted in their response to the Defendants' 12(M) Statement that, for most of its existence, VMI was run out of Chuck Vacala's home and in fact, did not share office space with VCI. (Defendants' 12(M) Statement, ¶¶ 31, 58, 61; Funds' Response, ¶¶ 31, 58, 61). When VCI did share office space with VCI, it had its own set of offices, for which it paid rent to Pat Vacala. (Defendants' 12(M) Statement, ¶ 61; Funds' Response, ¶ 61).

Finally, Plaintiffs contend that VMI and VCI function jointly on a daily basis. In support of this contention, Plaintiffs argue that the majority of the carpentry jobs performed by VMI are those performed under the leasing agreement with VCI.

Review of the evidence related to this factor indicates that VMI did not share identical business operations with VCI. The evidence regarding VMI's sharing of office space establishes that, for the bulk of VMI's existence, the two companies were run out of separate locations. The evidence related to the joint daily functioning of the two companies indicates nothing more than the normal relationship that exists between a general contractor and a subcontractor. Finally, with respect to the evidence on the issue of financial dependency, there is no evidence that VMI would have gone out of business without VCI, or that VMI was dependent upon VCI for its financial well being. There is no dispute that VMI obtained very significant amounts of work from other general contractors. Furthermore, there is nothing sinister about two family owned companies contracting with each other on a regular basis and Plaintiff has presented no evidence that requires this Court to read such a motive into this relationship. Consequently, the Plaintiffs have failed to present a genuine issue of material fact on the issue of identical business operations.

### 4. *Shared Equipment and Materials*

While Defendants admit that VMI employees who were leased to VCI would sometimes use VCI equipment if necessary, Defendants allege that this is a common industry practice. Plaintiffs, on the other hand, contend that this sharing of equipment, in addition to VMI's sharing of VCI's phone and fax lines and some of VCI's office equipment, is sufficient to establish the sharing of equipment for alter-ego purposes.

Despite the Plaintiffs' allegations, the evidence presented falls far short of establishing that VMI was effectively dependent on VCI for the materials it needed to stay in business. As the *Duguid* court pointed out, this type of sharing of equipment is not

indicative of alter ego status. 761 F.Supp. at 1354–55. Rather, as VMI's uncontested evidence establishes, this type of occasional borrowing is typical in the industry. Further, VMI's use of VCI's phone and fax line and occasional use of office equipment was nothing more than a convenience for Nan Hoste and the other VCI staff who assisted VMI with its paper work. Such evidence can hardly establish that VMI was relying on VCI's equipment to operate its business. Therefore, Plaintiffs have presented no evidence that raises a genuine issue of material fact with respect to the issue of shared equipment.

### 5. *Common Ownership*

Both parties agree that this factor is satisfied. Pat is the sole share holder of VCI, however, Pat, Chuck, and Vince all own stock in VMI (49%, 49%, 2%, respectively).

### *Conclusion*

The Plaintiffs have failed to present sufficient evidence to raise a genuine issue of material fact as to the Defendants' intent, and on this basis alone, the Court finds that VCI was not the alter ego of VMI, and therefore grants the Defendants' motion for summary judgment as to the alter ego claims in the Plaintiffs' complaint. Additionally, the Court finds that, because only one[6] of the remaining five alter ego factors is present, there is insufficient evidence to raise a genuine issue of material fact as to VCI's alter ego status based on these factors. Therefore, summary judgement on the alter ego claim is also appropriate on this basis as well. To restate this Court's ruling, the Defendants' motion for summary judgment is granted as to Plaintiffs' claims against VCI predicated on the alter ego theory and denied as to any claims Plaintiffs have against VMI directly for under-reporting hours.

---

6. The sole factor established is common ownership.