**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOUTHERN CALIFORNIA PAINTERS &
ALLIED TRADES, DISTRICT COUNCIL
NO. 36,
              *Plaintiff-Appellant,*

              v.                                     No. 06-56246
                                                     D.C. No.
RODIN & CO., INC., a California                      CV-04-129 AHM
corporation; SOUTHERN CALIFORNIA                     (PLAx)
PAINTING, INC., a California
corporation,                                         OPINION
              *Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
April 7, 2008—Pasadena, California

Filed March 10, 2009

Before: Alfred T. Goodwin, Andrew J. Kleinfeld, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

**COUNSEL**

Ellen Greenstone, Rothner, Segall, & Greenstone, Pasadena, California, for the plaintiff-appellant.

John J. Strumreiter and Barbara J. Klass, Brown, Brown, & Klass, Agoura Hills, California, for defendant-appellee Rodin & Co., Inc.

Gregory J. Khougaz, Santa Monica, California, for defendant-appellee Southern California Painting, Inc.

## OPINION

BYBEE, Circuit Judge:

Plaintiff-appellant Southern California Painters & Allied Trades, District Council No. 36 ("the Union") brought suit, alleging that defendants-appellees Rodin & Co., Inc. ("Rodin") and Southern California Painting, Inc. ("SCP") were alter egos, and that Rodin was therefore bound by the Master Labor Agreement signed by SCP. For the reasons set forth below, we affirm the district court's judgment in favor of Rodin and SCP.

### I.     BACKGROUND

A.  *Facts*

Rodin is a commercial painting contractor in Los Angeles. It has been in business for over eighteen years, employs more than seventy people, and completes more than one thousand commercial painting jobs each year. Fred Rodin[1] is the sole shareholder of Rodin and is responsible for its daily operations. Rodin is not a party to any union collective bargaining agreements. Ron Benveniste and Fred Rodin have been friends since the mid-1980s. Benveniste established a residential painting business in 1979. In 2001, he wanted to expand his business to include commercial painting services, so he

---

[1]Because Fred Rodin named his company after himself, we will refer to him as "Fred Rodin" or "Fred" and the company simply as "Rodin."

consulted with Fred, who already had experience in the commercial painting market. He told Benveniste that there were painting jobs Rodin could not perform as a non-union contractor, and recommended that Benveniste create a union company. Fred also advised that starting a union company would allow Benveniste to call the union when he needed painters rather than maintain a standing workforce.

On September 21, 2001, Benveniste formed SCP. In March 2002, Benveniste signed the Union's Master Labor Agreement ("MLA") on behalf of SCP, which allowed SCP to bid on Union projects and required SCP to meet certain obligations, such as paying union wages on all of its projects. The MLA prohibited SCP from "double-breasting," that is, running both union and non-union painting businesses. When the first MLA expired in 2003, SCP signed a second MLA, which was in effect from 2003 until June 30, 2006.

SCP rented office space separate from Benveniste's residential painting business, and bought furniture, purchased supplies, and installed telephone and fax lines at its office. Fred introduced Benveniste to contractors who performed Union jobs. He asked some Rodin employees to provide startup help to SCP, and calls and faxes to SCP were often forwarded to Rodin's offices. Fred also informally asked one of his employees, Candace Weisz, to help Benveniste set up his bookkeeping. Weisz set up payroll, payables and receivables, and helped Benveniste complete Union paperwork, for which she was not compensated. Rodin employees were not asked to track the time they spent on SCP matters; they believed that the time they spent handling SCP matters was trivial and would last only until SCP had sufficient capital to hire its own staff. The parties dispute whether Fred Rodin also contributed several thousand dollars in start-up money for SCP. Neither Fred nor Rodin, however, had an ownership interest in or received any benefits from SCP.

Aside from this assistance, the Union alleged that Rodin and SCP worked together or overlapped on several jobs. One

was the "Ticketmaster job." SCP had been hired to paint Ticketmaster's offices and needed to use a specific product to complete the job according to the contract. SCP contacted the Union several times over a two-week period, but the Union was unable to provide anyone familiar with the product. To finish the contract, SCP hired four non-union painters who were familiar with the product. Some of the non-Union workers SCP hired also had worked for Rodin, although Rodin played no role in hiring these painters and received no compensation for their work. Benveniste does not recall if he paid the non-Union painters the prevailing Union wage. After a hearing, the Union fined SCP $2,524 for hiring non-union painters. SCP paid the fine.

The second job in which SCP and Rodin both were involved was the "Bank of America job." Rodin had received an invitation to bid on the job, but could not because it was a Union job. SCP, however, successfully bid on the job and executed a contract on September 25, 2003. A year later, in September 2004, the contractor issued a change order specifying that Rodin would complete some touch-up work. In October 2004, Rodin entered a subcontract to perform additional work on the Bank of America project.

From 2001 to 2004, SCP performed only seventeen jobs. During the same period Rodin performed over 2500 jobs. In mid 2004, Benveniste concluded that it was not profitable to run SCP, and SCP ceased operations.

B.  *Procedural History*

The Union brought suit against Rodin and SCP seeking a declaratory judgment that Rodin and SCP were a single employer and/or alter egos, monetary damages and other relief for breach of the collective bargaining agreement and violations of California law. The Union alleged that as a single employer or alter egos, Rodin and SCP were both bound by the MLA. The Union further alleged that Rodin formed

SCP to avoid Rodin's obligations under the MLA. Finally, the Union alleged that Rodin and SCP breached the MLA by running a "dual shop" and that Rodin failed to abide by the MLA in a variety of ways.

Rodin, joined by SCP, and the Union filed cross-motions for summary judgment. The district court ruled only on the federal claims for declaratory relief and breach of the MLA. It found that SCP and Rodin were not alter egos, and therefore granted summary judgment in favor of Rodin and SCP on those claims.

In response to the district court's order, the Union filed another motion for summary judgment, focusing on the "single employer" theory of liability against SCP only. In July 2006, the district court requested a status report addressing whether SCP was still a signatory to any MLA. In response, SCP contended that it was no longer bound by the MLA because it had given notice to the Union of its cessation of operations and the MLA had expired June 30, 2006. The Union claimed that because SCP had not given proper notice of its inactive status, the MLA had automatically renewed and SCP was bound by the successor MLA. On August 4, 2006, the district court found that SCP was no longer a signatory to any MLA still in effect and had not conducted business since 2004. It then denied as moot the remaining claims because the Union failed to show it was entitled to any damages or declaratory relief. The district court entered judgment in favor of Rodin and SCP on all federal claims and dismissed the state law claims. The Union timely appealed.

## II.   ANALYSIS

There are two related but distinct theories, the alter ego and single employer doctrines, that prevent contractors from using double-breasted operations to avoid collective bargaining obligations.[2] *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d

---

[2]Double-breasted operations are those in which the same contractor owns both union and non-union companies. *UA Local 343 v. Nor-Cal*

1465, 1469-70 (9th Cir. 1995). Both theories, which overlap substantially, require the district court first to determine whether the two entities are a single employer. *Id.* at 1470; *A. Dariano & Sons, Inc. v. Dist. Council of Painters No. 33*, 869 F.2d 514, 519 (9th Cir. 1989). This determination entails examining "the degree of common ownership, management, operations, and labor relations." *Nor-Cal Plumbing, Inc.*, 48 F.3d at 1470. If the threshold single employer requirement is met, the next step depends on the theory of liability pursued. *Id.*

The district court assumed without deciding that Rodin and SCP met the single employer requirement.[3] We also assume without deciding that Rodin and SCP were a single employer. With that assumption, we address below the alter ego and single employer doctrines. We then turn to whether the Union's claim for declaratory relief against SCP is moot. Finally, we address whether the district court properly dismissed the remaining state law claims.

A.   *Alter Ego and Single Employer Liability of Rodin and SCP*

1.   Alter Ego Liability

[1] The alter ego doctrine is "designed to prevent employers from escaping their collective bargaining obligations by shifting work to non-union firms they also own." *Nor-Cal Plumbing, Inc.*, 48 F.3d at 1475. Employers may not create

---

*Plumbing, Inc.*, 48 F.3d 1465, 1469 (9th Cir. 1995). Double-breasting is legal as long as it is not engaged in for the purpose of avoiding collective bargaining obligations. *Id.* at 1469-70. We review *de novo* the grant of summary judgment. *Id.* at 1471.

[3]It is bound to cause confusion, but the single employer theory of liability and the first step of the analysis share the same name. The district court assumed single employer status for purposes of the first step of the analysis; it did not assume liability under the single employer theory.

non-union "alter egos" for the fraudulent purpose of shifting union work to a non-union company and thereby engaging in a sham to avoid their collective bargaining obligations. *Id.* at 1470; *see also Howard Johnson Co., Inc. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 259 n.5 (1974) (describing an alter ego as a "paper transaction without any meaningful impact on the ownership or operation of the enterprise" for the purpose of avoiding a unionized company's collective bargaining agreements); *Brick Masons Pension Trust v. Indus. Fence & Supply, Inc.*, 839 F.2d 1333, 1337 (9th Cir. 1988).

**[2]** The alter ego doctrine applies if two entities function as a single employer and the non-union entity is "being used in a sham effort to avoid collective bargaining obligations, . . . rather than for the pursuit of legitimate business objectives untainted by 'union animus.' " *Nor-Cal Plumbing, Inc.*, 48 F.3d at 1470 (internal quotation marks and citation omitted). The plaintiff has the burden of proving a "disguised continuation," technical change, or sham undertaken for the purpose of shifting union work to a non-union company. *A. Dariano & Sons, Inc.*, 869 F.2d at 519; *Brick Masons Pension Trust*, 839 F.2d at 1337.

**[3]** The Union's alter ego claim does not fit within this established framework. Rather, the Union brings what it terms a "reverse" alter ego claim. Whereas a traditional alter ego claim consists of a *union* employer opening a *non-union* company to avoid *existing* collective bargaining obligations, the Union's novel "reverse" alter ego claim consists of a *non-union* employer allegedly opening a *union* company to avoid *future* collective bargaining obligations.

**[4]** We know of no court that has recognized a reverse alter ego doctrine, and at least one court that has explicitly rejected it. *See Chicago Dist. Council of Carpenters Pension Fund v. Vacala Masonry, Inc.*, 946 F. Supp. 612, 618 (N.D. Ill. 1996). The Northern District of Illinois reasoned that to recognize a "reverse" alter ego doctrine would be "patently inequitable

and illogical," because a company that has not signed a collective bargaining agreement cannot simultaneously be avoiding a collective bargaining agreement. *Id.* at 618 (citation omitted).

> [T]he alter ego doctrine was not intended to be used as a means of coercing a non-union company into becoming a union company by requiring it to sign a collective bargaining agreement or by requiring it to comply with the terms of a collective bargaining agreement which it never signed, absent proof that the non-signatory company was being used by the signatory to avoid its collective bargaining agreement obligations.

*Id.* We find this reasoning persuasive. Because the alter ego doctrine prevents union employers from avoiding collective bargaining obligations, it does not apply in the "reverse" where a non-union employer creates a union company because the non-union employer has no collective bargaining obligations to avoid. Absent some indication that SCP was using Rodin to avoid SCP's union obligations, the alter ego doctrine is simply inapposite.

**[5]** We decline to recognize a "reverse" alter ego doctrine. The alter ego doctrine was never intended to coerce a non-union company into becoming a union company by requiring its compliance with a collective bargaining agreement it never signed, with a union its employees never authorized to represent them. Rodin is not bound by the MLA or liable under the alter ego doctrine because a non-union company cannot be guilty of evading a collective bargaining agreement that it never entered into. The doctrine is also inapplicable to SCP because SCP did not use Rodin to avoid SCP's union obligations.

**[6]** Nor has the Union made out a claim under the alter ego doctrine. There is no evidence that joint operations between

Rodin and SCP were for the purpose of avoiding SCP's obligations under the MLA. Likewise, there is no evidence that Rodin diverted union work from SCP at all, let alone that Rodin did so to help SCP avoid SCP's obligations under the MLA. The only examples that the Union can provide of work originally intended for SCP but completed by Rodin are the Bank of America and Ticketmaster projects. However, the Bank of America project was completed only after SCP had ceased business operations entirely, so SCP could not have been avoiding obligations it had under the MLA. The Ticketmaster job is similarly unhelpful for the Union's argument. SCP admits to having hired moonlighting non-Union painters to complete the Ticketmaster job, some of whom also worked for Rodin. However, it did so only after attempting to employ Union painters, and there is no evidence that Rodin benefited from that arrangement. Only the individual moonlighting painters were paid. Moreover, the Union fined SCP and SCP paid the fine. In neither case did jobs go to Rodin that would have gone to SCP.

Finally, SCP—the union company—was created fifteen years after Rodin, and SCP never came close to generating the quantity of business that Rodin consistently performed. During the three years SCP operated, it handled seventeen jobs; during the same period, Rodin accepted more than 2500 jobs. There is no evidence of any shift in business from SCP to Rodin. Although there may have been tension between Rodin and the Union, that tension does not support a finding that SCP violated the MLA.[4]

---

[4]The Union points to statements by Fred Rodin indicating his displeasure with the Union's organizing activities and his perception that the Union had a "continued campaign of harassment against him." Fred stated that he "felt that [the Union] was out to get him" and attributed the loss of jobs to Union employers to the union. Yet these statements do nothing more than show that Fred was displeased with the efforts of the Union to organize, even if those organizing activities were perfectly legal. The statements provide no basis to conclude that Fred actively took steps to undermine legitimate Union activities or that SCP attempted to avoid its MLA obligations by using Rodin improperly. *See, e.g.*, *Nor-Cal Plumbing, Inc.*, 48 F.3d at 1471-72.

**[7]** Likewise the evidence does not suggest that SCP used Rodin to avoid SCP's obligations under the MLA, or that Rodin used SCP to benefit from SCP's Union labor force. That some Rodin employees offered clerical assistance to SCP does not support the Union's claim because SCP satisfied its obligations under the MLA. Not a single Union witness contended that SCP diverted Union jobs to Rodin to avoid obligations under the MLA; in fact, at least one witness indicated that any shift in jobs that occurred went in the other direction—from Rodin, the non-union company, to SCP, the union company. The district court therefore did not err in granting summary judgment in favor of Rodin and SCP on the alter ego doctrine.

### 2.  Single Employer Liability

**[8]** Under the single employer theory, a collective bargaining agreement can extend to a non-union company only if the NLRB finds that the employees of both the union and non-union companies constitute a single bargaining unit. *Nor-Cal Plumbing, Inc.*, 48 F.3d at 1470. That the companies in question "may constitute a single employer does not necessarily . . . make them a single bargaining unit." The bargaining unit question is a "representational question [that] must be decided by the NLRB in the first instance." *Id.* Without an NLRB determination that the employees of the union and non-union entities constitute a single bargaining unit, the doctrine of primary jurisdiction bars the district court from extending a collective bargaining agreement to a non-union entity. *Id.* at 1469-70.

**[9]** The Union has not shown that the NLRB determined that the employees of Rodin and SCP constituted a single bargaining unit. The district court could not have extended the MLA to Rodin, and the Union's claim under the single employer theory cannot be maintained.[5]

---

[5]The district court entered judgment in favor of SCP and Rodin, but did not separately address the single employer theory. However, "[w]e may

**[10]** Because Rodin and SCP do not satisfy the requirements for alter ego or single employer liability, the district court properly granted summary judgment in their favor.

## B. *Mootness of the Remaining Claims Against SCP*

The Union also appeals the district court's ruling that its claims for declaratory relief and damages against SCP alone are moot.[6] The Union claims that Rodin and SCP were a single employer operating a dual shop and sought a declaration to that effect and damages for SCP's alleged violation of the MLA. We examine each issue in turn.

### 1. *Declaratory Relief*

The district court ruled that the Union's claim for declaratory relief was moot because SCP ceased operations in 2004, and the MLA to which SCP was a signatory expired on June 30, 2006. The Union argues that the declaratory relief claim is not moot because SCP voluntarily ceased its operations and could restart them at any time. The Union further argues that SCP did not give formal notice to the Union of its intent to not continue as a signatory to the MLA, so it remains a party to a renewed MLA that took effect on July 1, 2006. We reject these arguments.

Federal courts lack jurisdiction "[i]f an event occurs during the pendency of the appeal that renders the case moot." *Ctr. for Biological Diversity v. Lohn*, 511 F.3d 960, 963 (9th Cir. 2007). "When a plaintiff seeks declaratory relief . . . the 'test for mootness . . . is whether the facts alleged, under all the cir-

---

affirm on any ground supported by the record, even if it differs from the district court's rationale." *Downs v. Hoyt*, 232 F.3d 1031, 1036 (9th Cir. 2000).

[6]We review *de novo* questions of mootness. *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003).

cumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.' " *Id.* (quoting *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1174-75 (9th Cir. 2002) (internal quotations omitted; second ellipsis in original)). "Stated another way, the central question . . . is whether changes in the circumstances that prevailed at the beginning of litigation have forestalled any occasion for meaningful relief." *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1129 (9th Cir. 2005) (en banc) (internal quotation marks removed).

SCP ceased operations in 2004, and there is no evidence that SCP will begin operations again. Even if SCP were to resume operations under the same relationship with Rodin, the MLA to which SCP was a party expired over two years ago.

There is no basis for awarding declaratory relief on an expired agreement. The Union argues that SCP automatically became a party to the successor MLA because it did not provide formal notice of its intent to withdraw from the MLA to the Union. This argument is without merit. The MLA provides that a signatory to the agreement may withdraw by giving written notice to the Union. Termination of the agreement would be effective the following June 30. By August 5, 2004, SCP provided notice to the Labor Management Cooperating Committee ("LMCC")—the entity that maintains the Union's collective bargaining agreements for painting contractors—that SCP was no longer doing business. This notice was plainly sufficient. Benveniste had joined the Union by tendering its application to the LMCC and by meeting with Wiley Zagajeski, a Union employee. Likewise, SCP tendered its notice of termination to the LMCC and Zagajeski. Accordingly, the Union's argument that SCP did not notify it of the cessation of SCP's business operations is formalistic and disingenuous. SCP is not a signatory to an unexpired MLA.

**[11]** A declaratory judgment that SCP and Rodin constituted a single employer therefore would not resolve adverse legal issues between SCP and the Union. The Union stated, however, that although SCP is no longer in business, it could use such a judgment in its dealings with other contractors and it would strengthen the Union's position in future dealings. We decline to use our authority in this way. This sort of declaratory relief would constitute an advisory opinion and does not evidence a live dispute between the parties in this case. Because SCP has been out of business for over four years, and is no longer a party to a current MLA, there is no longer a "substantial controversy" for this court to resolve and no "occasion for meaningful relief." *Gator.com Corp.*, 398 F.3d at 1129. The district court therefore did not err in dismissing the Union's declaratory relief claim against SCP as moot.

## 2. *Damages*

**[12]** The Union argues that two claims for damages against SCP are still viable. First, the Union claims that SCP underreported the number of hours Union employees worked and therefore owes $625.71 in back dues. However, SCP paid the back dues under protest, and does not seek a refund from the Union of the $625.71. Accordingly, the Union would not recover any damages from SCP even if this court were to resolve the single employer issue in the Union's favor.

Second, the Union claims that it is owed damages as a result of work Rodin performed on the Bank of America project. However, the Union does not claim that jobs improperly went to Rodin rather than SCP. Rather, it claims that all jobs Rodin performed were governed by the MLA, a claim we have rejected. The district court properly dismissed this claim.

## C. *Supplemental Jurisdiction*

**[13]** Finally, the Union asks us to reinstate the state law claims the district court dismissed without prejudice after

resolving all of the federal claims. Because the district court appropriately dismissed all of the federal claims, it acted within its discretion in declining to resolve the state law claims under its supplemental jurisdiction. *See, e.g.*, *Fichman v. Media Ctr.*, 512 F.3d 1157, 1162-63 (9th Cir. 2008).

## III.   CONCLUSION

The judgment of the district court is AFFIRMED.