Mark H. Lipton, Lipton & Lipton, San Ramon, Cal., and William Morgan Bennett, San Francisco, Cal., for plaintiffs-appellants.

Robert M. Hirsch, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for defendant-appellee.

**CMSH COMPANY, INC., CMSH Framing, Plaintiffs–Appellants,**

v.

**CARPENTERS TRUST FUND FOR NORTHERN CALIFORNIA, Defendant–Appellee.**

**No. 90–15646.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 12, 1991.

Decided April 28, 1992.

Before HUG, SCHROEDER, and WIGGINS, Circuit Judges.

WIGGINS, Circuit Judge:

### OVERVIEW

CMSH Company, Inc. (CMSH) and CMSH Framing (Framing) appeal a district court order upholding an arbitration award in favor of Carpenters Pension Trust Fund (Fund) for withdrawal liability under the Employee Retirement Income Security Act (ERISA). 29 U.S.C. § 1381(a) (1988). The arbitrator found that the appellant corporations were alter egos and that CMSH was therefore responsible for the liability incurred when Framing withdrew from its ERISA pension plan. The district court affirmed the arbitrator's judgment. CMSH argues on appeal that it is not responsible

for Framing's independent withdrawal liability. This court has jurisdiction over CMSH's timely appeal pursuant to 28 U.S.C. § 1291 (1988). We reverse.

## BACKGROUND

CMSH, a California Corporation, was founded in 1972 as a licensed California contractor. In June 1974, William Crouse, the president of CMSH, signed a collective bargaining agreement with Carpenters 46 Northern California Counties Conference Board (Carpenters). The initial three-year agreement ended in June 1977, and the contract was renewed for another three-year period, 1977–80. CMSH employed workers and made payments to the Fund under the terms of the bargaining agreement from 1974 until mid–1978. Crouse and Robert Hagood were the sole owners of CMSH, each owning 50%.

On July 11, 1978, Framing was incorporated in California as a licensed contractor. Although there was an overlap of ownership between CMSH and Framing, ownership was not identical. Crouse and Hagood each owned 27.5% of Framing, but Michael Stiles, the president of Framing, owned the remaining 45% and was therefore the biggest Framing shareholder. Framing took over CMSH's operations under the collective bargaining agreement with Carpenters.

Framing did not enter a new agreement with Carpenters but instead hired workers under the terms and conditions of the old bargaining agreement negotiated by CMSH. This agreement expired on June 15, 1980, and Framing attempted to negotiate a new agreement with Carpenters. Framing continued to employ workers and contribute to the Fund until October 1982, when it reached an impasse in negotiations with Carpenters.

Framing had its own contractor's license, bond, and bank accounts, and all checks made out to the Fund after mid–1978 were drawn from Framing's independent bank accounts. Additionally, Framing operated independently and primarily performed work for employers unrelated to CMSH. Between 1978 and 1982, approximately ninety percent of Framing's work was for employers other than CMSH.

However, all negotiations between Carpenters and Framing, like the negotiations between Carpenters and CMSH, were conducted by Crouse, the president of CMSH and the vice-president of Framing. Stiles, the president of Framing, was never directly involved with the negotiations. Moreover, an employee of both CMSH and Framing handled the contribution report forms submitted to the Fund. Indeed, it appears that Carpenters never recognized CMSH and Framing as separate corporations.

After Framing was dissolved on September 30, 1986, the Fund notified CMSH and Framing of a withdrawal liability assessment of $229,170 pursuant to 29 U.S.C. section 1381(a). The Fund treated CMSH and Framing as one employer for purposes of the liability. By order of the district court, the liability issue was submitted to an arbitrator. The arbitrator determined that CMSH and Framing were alter egos and jointly responsible for the withdrawal liability. On April 25, 1990, the district court upheld the arbitrator's judgment. This appeal followed. The appellants' only argument on appeal involves the liability of CMSH; they do not contest the independent withdrawal liability of Framing.

## DISCUSSION

The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. §§ 1381–1453 (1988), amended ERISA to include mandatory liability on employers withdrawing from established pension plans. *See Board of Trustees of the W. Conf. of Teamsters Pension Trust Fund v. Lafrenz*, 837 F.2d 892, 893 (9th Cir.1988); *Connors v. Ryan's Coal Co.*, 923 F.2d 1461, 1462–63 (11th Cir.1991). In the event of a dispute over employer withdrawal liability, the MPPAA mandates arbitration proceedings. 29 U.S.C. § 1401(a) (1988).

In this case, the arbitrator awarded and the district court affirmed withdrawal liability against both CMSH and Framing in the amount of $229,170. The arbitrator's

factual findings are presumed correct, and the presumption is "rebuttable only by a clear preponderance of the evidence." 29 U.S.C. § 1401(c); *see Trustees of the Amalgamated Ins. Fund v. Geltman Indus.,* 784 F.2d 926, 929 (9th Cir.), *cert. denied,* 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986). The arbitrator's conclusions of law are reviewed de novo. *Geltman,* 784 F.2d at 929 (citing *Board of Trustees v. Thompson Bldg. Materials,* 749 F.2d 1396, 1405–06 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985)).

CMSH makes two primary arguments on appeal. First, it contends that the arbitrator erred in determining that CMSH and Framing are jointly liable under the MPPAA for the assessed withdrawal liability. Second, CMSH contends that the dismissal with prejudice of a California case brought by the Fund in 1989 against CMSH bars the Fund's withdrawal liability claim under the doctrine of res judicata. Because we agree with CMSH's first argument that alter ego principles were inapplicable in this case, we reach no conclusion on CMSH's res judicata argument.

### I. *CMSH's Withdrawal Liability*

The central issue on appeal is the arbitrator's legal conclusion that CMSH and Framing are jointly liable for withdrawal liability purposes. Framing replaced CMSH as the employer more than two years before the MPPAA was enacted, and CMSH had ceased all covered operations and had stopped making pension contributions by the time its 1977–80 contract with Carpenters had expired. The termination of the contract marked CMSH's complete withdrawal from the plan, and the independent withdrawal date for CMSH is June 15, 1980, the date the 1977–80 contract terminated. Thus, if the corporations are independent entities, CMSH has no withdrawal liability under the MPPAA because employers who withdrew from pension funds prior to September 26, 1980 have no MPPAA withdrawal liability. *See* 29 U.S.C. § 1461(e)(1)–(2); *Woodward Sand Co. v. Western Conf. of Teamsters Pension Trust Fund,* 789 F.2d 691, 694 (9th Cir. 1986).

Framing does not dispute that it incurred withdrawal liability. However, because Framing replaced CMSH as the employer and CMSH ceased all covered operations prior to the effective date of the MPPAA, CMSH is liable only if it and Framing are treated as the same corporation. *See Teamsters Pension Trust Fund v. Central Mich. Trucking,* 698 F.Supp. 698, 700–03 (W.D.Mich.1987) (a predecessor employer does not incur liability for the subsequent withdrawal of the successor employer), *aff'd,* 857 F.2d 1107 (6th Cir.1988).

We begin by reviewing the statutes and regulations that determine whether two corporations can be treated as one for purposes of assigning MPPAA withdrawal liability. By its terms, the MPPAA applies to businesses under common control: "[A]ll employees of trades or businesses (whether or not incorporated) which are under *common control* shall be treated as employed by a single employer and all such trades or businesses as a single employer." 29 U.S.C. § 1301(b)(1) (1988) (emphasis added). The term "businesses under common control" is defined by regulations coextensive with the regulations under 26 U.S.C. § 414(c) which in turn define common control according to 26 U.S.C. § 1563(a). *See* 29 U.S.C. § 1301(b)(1), 26 U.S.C. § 414(b)–(c); *Pension Benefit Guar. Corp. v. Ouimet Corp.,* 630 F.2d 4, 10–11 (1st Cir.1980), *cert. denied,* 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981).

"Businesses under common control" include "brother-sister" groups of corporations, as that term is defined:

> The term "brother-sister group of trades or businesses under common control" means two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of § 1.414(c)–4) a *controlling interest* in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such

persons are in effective control of each organization.

26 C.F.R. § 1.414(c)–2(c)(1) (1991) (emphasis added); *see also* 26 U.S.C. § 1563(a)(2) (1988); *Lafrenz*, 837 F.2d at 893. Thus, the same group of individuals must have a "controlling interest" in both corporations for the corporations to be a brother-sister group. The regulations define "controlling interest" as follows:

> In the case of an organization which is a corporation, ownership of stock possessing at least 80 percent of total combined voting power of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation;

26 C.F.R. § 1.414(c)–2(b)(2)(A).

Both CMSH and the Fund rely on these provisions. However, by claiming that CMSH and Framing constitute a brother-sister group under the regulations, the Fund misreads the regulations. The ownership structure of the corporations establishes that they are not brother-sister businesses. The same five or fewer persons do not have a controlling interest in both CMSH and Framing; Crouse and Hagood, while owning 100% of CMSH, owned only 55% of Framing. A controlling interest is 80%, and Crouse and Hagood's ownership of Framing is well below that level.

Stiles' ownership in Framing is irrelevant for calculating controlling interest because he does not have any ownership in CMSH. *See* § 1.414(c)–2(e) (example (4)). Apparently, the Fund's misunderstanding and misapplication of the regulations stems from its failure to recognize that "a person's stock ownership is not taken into account for purposes of the 80% control test unless that person owns stock in each corporation of the putative brother-sister group." 53 Fed.Reg. 6603 (Mar. 2, 1988) (discussing regulations promulgated under ERISA). Because Stiles does not own stock in both Framing and CMSH, his stock ownership in Framing cannot be considered for purposes of the controlling interest test.

The Fund's interpretation of ERISA's common control requirement was squarely rejected by the Supreme Court in *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 102 S.Ct. 821, 70 L.Ed.2d 792 (1982). In *Vogel Fertilizer*, the Court held that a person's stock ownership cannot be taken into account for the purposes of section 1563(a)'s 80% control requirement unless that person owns stock in each corporation of the brother-sister group. Because Congress used section 1563(a)'s 80% control test for ERISA common control purposes, the Fund is bound in this case by the *Vogel Fertilizer* precedent. Indeed, the applicable regulations follow *Vogel Fertilizer* and make clear that CMSH and Framing are not a brother-sister group. *See* 26 C.F.R. § 1.414(c)–2(b)(2)(A), (c)(1), (e).

Neither the arbitrator nor the district court addressed *Vogel Fertilizer* or the provisions mandated by Congress. Without analyzing the applicable common control provisions, the arbitrator applied an alter ego theory based on this court's decision in *J.M. Tanaka Const. v. N.L.R.B.*, 675 F.2d 1029, 1033–35 (9th Cir.1982). Although the alter ego doctrine is recognized generally in the labor law context, *see id.* (alter ego corporation bound to preexisting collective bargaining agreement); *Haley & Haley, Inc. v. N.L.R.B.*, 880 F.2d 1147, 1149–52 (9th Cir.1989) (same), the arbitrator and district court erred in applying the alter ego doctrine.

Alter ego analysis like that applied in *Tanaka* does not impose liability for a statutory obligation that did not exist at the time the alter ego entity was formed. The alter ego doctrine from *Tanaka* only applies when the alter ego is formed to avoid a preexisting duty. *Cf. Haley & Haley*, 880 F.2d at 1149 ("the alter ego transfer is in essence a sham transaction, motivated by the employer's desire to avoid its contractual obligations"); *Audit Servs. v. Rolfson*, 641 F.2d 757, 764 (9th Cir.1981) (before piercing the corporate veil in an action to recover fringe benefit fund payments, a court must find that an alter ego corporation was formed with "fraudulent intent" to avoid a duty to make payments).

In *Tanaka*, the J.M. Tanaka Construction Company had a preexisting duty to make fringe benefit payments to the union under a collective bargaining agreement. After J.M. Tanaka fell behind on its payments to the union, it ceased operations, and R.M. Tanaka Construction was formed to replace J.M. Tanaka. R.M. Tanaka "was created for the purpose of eliminating the high cost of dealing with the union" and continued operations without making the payments to the union mandated by the collective bargaining agreement. *Id.* at 1035. In the absence of any federal statute governing such a situation, this court held that R.M. Tanaka retained J.M. Tanaka's preexisting duty to make fringe benefit payments under the collective bargaining agreement because the two companies were alter egos.

In the present case, CMSH never had a duty to make a withdrawal payment. As discussed above, CMSH incurred no independent withdrawal liability because it withdrew from the pension plan before the MPPAA was passed on September 26, 1980. CMSH ceased operations covered under the plan in mid–1978 and terminated any obligations under the collective bargaining agreement when the agreement expired on June 15, 1980.

When Framing took over CMSH's operations, pursuant to *Tanaka*, it also assumed CMSH's preexisting duty to make payments under the collective bargaining agreement. Framing was not charged with the duty to make a withdrawal payment, however, until after the MPPAA was enacted. Moreover, Framing's duty under *Tanaka* to make the payments required by the collective bargaining agreement ceased to exist when the agreement expired.

Thus, when the collective bargaining agreement expired on June 15, 1980, neither CMSH nor Framing was bound by any collective bargaining agreement or had any obligation to make pension payments. Any obligations incurred after that point were incurred by Framing alone. Even if CMSH could be held liable for pension payment obligations Framing incurred after the collective bargaining agreement expired,[1] CMSH cannot be held liable for Framing's withdrawal liability. CMSH never had any withdrawal liability, and the creation of Framing was not an attempt to avoid a preexisting duty.

Interestingly, the Fund itself supports this analysis by arguing that the statutory duty to make a lump sum withdrawal payment must be viewed separately from the obligation to make pension payments under the collective bargaining agreement. In its attempt to avoid res judicata, the Fund admits that CMSH's obligations pursuant to the collective bargaining agreement do not necessarily extend to any withdrawal liability obligation. Thus, even if CMSH were liable for Framing's contractual obligations under *Tanaka*, CMSH is not liable for Framing's statutory withdrawal liability.

In sum, the alter ego doctrine from *Tanaka* is inapplicable unless the alter ego is formed to evade a preexisting duty. Because CMSH and Framing are not a brother-sister group under the regulations governing ERISA common control analysis, CMSH is not responsible for Framing's withdrawal liability. We therefore reverse the district court's decision on this issue.

## II.  *Claim Preclusion*

On November 4, 1987, Carpenters filed suit against CMSH in Superior Court of California based on the terms of its collective bargaining agreement. The California action sought an injunction to compel an audit and contributions allegedly owed by CMSH from 1981 through 1983. In March 1989, the action was dismissed with prejudice when Carpenters determined that CMSH had filed a timely termination notice

---

**1.**  Actually, neither Framing nor CMSH was liable for pension payments under ERISA because Framing made the required payments until negotiations over a new agreement reached an impasse. *See Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.,* 484 U.S. 539, 545–51, 108 S.Ct. 830, 833–37, 98 L.Ed.2d 936 (1988) (there is no ERISA action to collect pension payments if a contract has expired and negotiations have reached an impasse).

in the Spring of 1980. CMSH now argues that the dismissal of the California action constitutes res judicata in the instant suit and thereby precludes Carpenters from asserting withdrawal liability.

Although CMSH's res judicata arguments have some merit, we do not address them. Given our decision on the merits of CMSH's federal law argument, an application of California law to resolve the res judicata issue is unnecessary.

## CONCLUSION

Because CMSH and Framing may not be treated as the same entity for purposes of ERISA withdrawal liability, CMSH is not liable for Framing's ERISA withdrawal liability. Therefore, we REVERSE the decision of the district court.

REVERSED.