**RESILIENT FLOOR COVERING PENSION FUND, et al., Plaintiff(s),**

v.

**M & M INSTALLATION, INC., et al., Defendant(s).**

No. C08–5561 BZ.

United States District Court, N.D. California.

Aug. 18, 2009.

Katherine Ann McDonough, Lisa Marie Schwantz, Michael James Korda, Kraw & Kraw, Mountain View, CA, for Plaintiff(s).

Stephen Thomas Davenport, Jr., Jeffrey Gordon McClure, Davenport Gerstner & McClure, Walnut Creek, CA, for Defendant(s).

## ORDER GRANTING SUMMARY JUDGMENT

BERNARD ZIMMERMAN, United States Magistrate Judge.

On December 12, 2008, plaintiffs Resilient Floor Covering Pension Fund and Board of Trustees of the Resilient Floor Covering Pension Fund ("plaintiffs") filed suit against defendants M & M Installation, Inc. ("M & M") and Simas Floor Co., Inc. ("Simas Floor") (collectively "defendants") to collect withdrawal liability in the amount of $2,414,228.00, pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").[1] Before the Court are the parties' cross motions for summary judgment.

Plaintiffs seek summary judgment on three grounds, asserting that Simas Floor is liable for M & M's withdrawal liability because Simas Floor and M & M were "alter ego" employers; because M & M wound up its operations and transferred its business to Simas Floor with a principal purpose of avoiding paying its withdrawal liability in violation of 29 U.S.C. § 1392(c); and because Simas Floor is the successor employer to M & M. Defendants seek summary judgment, arguing that Simas Floor is not liable for M & M's withdrawal liability because Simas Floor is not an "employer" within the meaning of the MPPAA, since it is neither under "common control" with M & M, as defined under ERISA section 1301(b)(1), nor the "alter ego" or "successor" of M & M. Simas Floor also seeks a declaratory judgment that a default has not occurred within the meaning of 29 U.S.C. § 1399(c)(5)(A)-(B) because it timely cured M & M's failure to pay the June 2008 withdrawal liability payment and timely requested review and arbitration of the Pension Fund's determination that Simas Floor is liable for M & M's withdrawal liability. Finally, Simas Floor seeks a refund of all withdrawal liability

---

1. All parties have consented to my jurisdiction, including entry of final judgment, pursuant to 28 U.S.C. § 636(c) for all proceedings. On June 29, 2009, by agreement of the parties, plaintiffs filed a first amended complaint, which added one additional theory of withdrawal liability based on "successor liability."

payments it made under protest, a total of $219,726.32.

## FACTUAL BACKGROUND [2]

It is undisputed that plaintiff Resilient Floor Covering Pension Fund ("Pension Fund") is a trust fund established and maintained pursuant to Section 302(c)(5) of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 186(c)(5). The Pension Fund is an employee benefit plan within the meaning of Sections 3(2) and 3(3) of ERISA, 29 U.S.C. § 1002(2) and (3), and is maintained for the purpose of providing retirement and related benefits to eligible participants. The Pension Fund is also a multiemployer pension plan within the meaning of Section 2(37) of ERISA, 29 U.S.C. § 1002(37). Plaintiff Members of the Board of Trustees of the Resilient Floor Covering Pension Fund ("Plaintiff Trustees") are fiduciaries within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

Defendant Simas Floor is a non-union residential and commercial flooring contractor, and a retailer of flooring products, with offices in Sacramento, Stockton, and Visalia. It was founded by Robert Simas in the 1950's. In the early 1990's, Robert Simas left the company and sold his shares to his three brothers, Ken, Jack and Dave Simas, leaving each of them with an equal 33.33% interest. Effective January 1, 2004, Ken, Jack and Dave Simas each transferred by gift and sale their shares to their respective children, Mark Simas, Michelle Simas Carli, and Craig Simas, who now each own 33.33% of Simas Floor. Mark Simas is Simas Floor's president and Michele Simas Carli and Craig Simas are vice-presidents. Along with their three fathers, the children also serve as Simas Floor's directors.

Defendant M & M was formed on June 1, 1994 by Mark Simas, as a residential flooring and tile contractor, which operated out of Simas Floor's Sacramento facility. According to Mark Simas, M & M was created to serve as a union signatory flooring contractor to allow non-union Simas Floor to bid on union jobs by subcontracting the work to M & M. M & M entered into collective bargaining agreements with Carpet, Resilient Flooring and Sign Workers Local Union No. 1237 ("Local 1237"), which covered M & M's flooring installers.[3] These agreements required M & M to make contributions to the Pension Fund on behalf of M & M's flooring installers.

When M & M's collective bargaining agreement came up for renegotiation in mid–2004, Painters District Council No. 16 ("District Council") had assumed control of Local 1237. During the ensuing negotiations, the District Council insisted that it would only sign a new collective bargaining agreement if M & M agreed that the new agreement would also cover Simas Floor's Sacramento flooring installers. Since Simas Floor did not want to become a union shop, M & M refused to agree to the District Council's demands, which led to an impasse in the negotiations and a strike by Local 1237 in July 2004.

After the strike, Mark Simas sent Local 1237 a letter dated July 8, 2004 stating that M & M was withdrawing recognition from the Union, effectively repudiating its collective bargaining agreement. M & M

---

2. To the extent that the Court relies on any facts objected to by either party, those objections are **OVERRULED.** Plaintiffs' unopposed request for judicial notice is **GRANTED,** to the extent of taking judicial notice of the fact that appellate briefs have been filed by the parties in Case No. 057688; not of the truth of the facts contained within those briefs.

3. M & M also employed tile setters, who were covered by a different collective bargaining agreement than its flooring installers.

thereafter stopped making contributions to the Pension Fund.

After withdrawing recognition from the Union, M & M and the union agreed to allow M & M to complete some outstanding jobs. M & M finished those jobs with the approximately twenty employees who returned to work after the strike, after they had resigned from the union. At the end of 2005, M & M laid off its remaining flooring installers, two of whom were hired by Simas Floor.

Around October 29, 2004, after it ceased to contribute to the Pension Fund, M & M received notice from the Pension Fund that M & M had been assessed a $2,414,228.00 withdrawal liability, with quarterly payments of $43,945.20 due every March, June, September, and December for a period of twenty years. Beginning in December of 2004 and through early 2008, M & M made quarterly installment payments, using at least in part Simas Floor's funds. After operating solely as a union tile setting contractor for approximately three years, M & M shut down its operations and wound up its business on April 30, 2008, selling its only assets (three used work trucks) to Simas Floor. By letter dated June 27, 2008, M & M notified the Pension Fund that it was going to stop making withdrawal liability payments because it had "ceased operations" and "wound up its affairs."

In a letter dated August 19, 2008, the Pension Fund notified M & M that its June 2008 payment was delinquent and demanded payment, contending that M & M was "still doing business under the name of either M & M Installations or Simas Floor Company" and that it "continues to be liable for withdrawal liability." M & M received the Pension Plan's Au-

gust 19, 2008 letter on September 8, 2008. After some negotiation, by letter dated November 6, 2008, Simas Floor sent the Pension Fund the June 2008 quarterly withdrawal liability payment, plus an additional amount representing interest, under protest.

At the end of November 2008, Simas Floor, through its attorney, wrote the Pension Fund requesting review in accordance with MPPAA Section 4219(b)(2), 29 U.S.C. Section 1399(b)(2), in order to preserve Simas Floor's right to a refund of the withdrawal liability amounts it had paid on behalf of M & M. On May 13, 2009, Simas Floor, again through its attorney, requested arbitration of the Pension Fund's determination that Simas Floor is liable for M & M's withdrawal liability.

Simas Floor has now paid, under protest, M & M's withdrawal liability payments for June 2008, September 2008, December 2008, March 2009 and June 2009, a total of $219,726.32. Simas Floor now claims that it is entitled to reimbursement of all payments made, and that it is not liable for the balance of M & M's withdrawal liability. The parties' central dispute concerns whether Simas Floor is responsible for the withdrawal liability incurred by M & M.

## THE ALTER EGO DOCTRINE

■ As a threshold issue, Simas Floor argues that it cannot be held responsible for M & M's withdrawal liability because it is not an "employer" within the meaning of the MPPAA, 29 U.S.C. § 1381.[4] Both parties agree that whether Simas Floor is an "employer" within the meaning of the MPPAA is a legal issue to be resolved by the Court. *See, e.g., Bowers on behalf of*

---

**4.** Section 1381 states, in relevant part: "(a) If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the

plan in the amount determined under this part [29 USCS §§ 1381 et seq.] to be the withdrawal liability." 29 U.S.C. § 1381(a).

*NYSA–ILA Pension Trust Fund v. Transportacion Maritima Mexicana,* 901 F.2d 258 (2d Cir.1990) (citing *Korea Shipping Corp. v. New York Shipping Ass'n–Int'l Longshoremen's Ass'n Pension Trust Fund,* 880 F.2d 1531, 1536 (2d Cir.1989)).

Plaintiffs contend that Simas Floor is an "employer" upon whom withdrawal liability should be imposed because Simas Floor and M & M are "alter egos".[5] A court may impose pension fund liability upon a nonsignatory to a collective bargaining agreement that is the "alter ego" of the signatory. *See Massachusetts Carpenters Cent. Collection Agency v. Belmont Concrete Corp.,* 139 F.3d 304, 307–08 (1st Cir.1998). The party asserting the alter ego doctrine has the burden of establishing it. *See U.A. Local 343 v. Nor–Cal Plumbing, Inc.,* 48 F.3d 1465, 1471 (9th Cir.1994).

Defendants do not dispute that an employer found to be the alter ego of another employer who has incurred withdrawal liabilities may be responsible for the latter's withdrawal liability. Nor do defendants dispute the first half of the alter ego doctrine—that there is sufficient common ownership, common management, interrelation of operations, and centralized control of labor relations between M & M and Simas Floor to satisfy the commonality requirement of the alter ego doctrine. (Def.'s Opp. p. 16:19–23.) This is not surprising, since it is undisputed that Simas Floor and M & M had substantially identical ownership and management and that Simas Floor formed M & M to allow Simas Floor to bid on union jobs. In fact, M & M had no source of business other than from Simas Floor and no office staff. The human resource operations of M & M, including the hiring, disciplining, and terminating of employees, were handled by Michelle Carli Simas, who was paid by Simas Floor, not M & M.[6] M & M employees worked out of the Simas Floor location in Sacramento and M & M did not pay Simas Floor for use of Simas Floor's Sacramento office space.[7] M & M had no phone line, fax line, or website of its own. All of the daily administrative work of M & M was performed by Simas Floor employees and staff, using Simas Floor's office and equipment. Simas Floor submitted all of M & M's bids and billed customers for work performed by M & M. M & M had no written subcontracts with Simas Floor. All the officers of M & M received salaries from Simas Floor; not from M & M. Simas Floor paid M & M only enough to cover M & M's overhead and expenses, so M & M's net income was close to zero. M & M never distributed any profits to its shareholders.

---

**5.** The Ninth Circuit has noted that "it may be perfectly legal for a contractor to conduct business through a 'double breasted' operation, one in which the same contractor owns both union and non-union companies for legitimate business purposes. In such cases, the collective bargaining agreement of the union firm does not ordinarily apply to the non-union firm. Out of concern, however, that some contractors would use double-breasted operations to avoid their collective bargaining obligations, the courts and the NLRB have developed two conceptually related, but distinct theories—'single employer' and 'alter ego'—to guard against such abuse." *UA Local 343 of the United Ass'n of Journeymen & Apprentices of the United States and Canada, AFL–CIO,* 48 F.3d 1465, 1469 (9th Cir.1994) (citing *Carpenters' Local Union No. 1478 v. Stevens,* 743 F.2d 1271, 1275–77 (9th Cir.1984), cert. denied, 471 U.S. 1015, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985)). Plaintiffs do not argue that Simas Floor and M & M are a "single employer" operating under "common control."

**6.** Defendants' objections that this evidence is not by the cited references provided by plaintiffs and out of context are **OVERRULED.**

**7.** Defendants' objection that this evidence is not by the cited references provided by plaintiffs is **OVERRULED.**

Instead of arguing that the commonality requirement of the alter ego test has not been satisfied, defendants insist that for Simas Floor to be found liable, plaintiff must prove that M & M "was created by the union employer for the purpose of evading the union employer's existing collective bargaining obligations." (Def.'s Opp. p. 14:1–4.) To support this proposition, defendants cite to *Nor–Cal,* 48 F.3d at 1470–1471, as well as a recent Ninth Circuit case, *Southern California Painters & Allied Trades, District Council No. 36 v. Rodin & Co., Inc.,* 558 F.3d 1028 (9th Cir.2009), upon which defendants relied heavily during oral argument. Neither of these cases, however, involved pension fund liability.[8] What the Ninth Circuit said in *Nor–Cal* was that the second half of the alter ego doctrine required the union to show that the non-union employer "was being used in a sham effort to avoid collective bargaining obligations." *Nor–Cal,* 48 F.3d at 1470 (citing *Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.,* 839 F.2d 1333, 1336 (9th Cir.1988)). The court then stated that to bind a non-union employer to a collective bargaining agreement signed by an affiliated union employer, the union would have to show that the non-union employer was "created in 'an attempt to avoid the obligations of [the union employer's] collective bargaining agreement through a sham transaction or

a technical change in operations.'" *Id.* at 1472 (quoting *A. Dariano & Sons, Inc. v. District Council of Painters No. 33,* 869 F.2d 514, 518 (9th Cir.1989)). In *Rodin,* the Ninth Circuit refused to use the alter ego doctrine to impose a collective bargaining agreement on a non-union employer that had allegedly created a separate union employer, stating that "[t]he alter ego doctrine was never intended to coerce a nonunion company into becoming a union company by requiring compliance with a collective bargaining agreement it never signed, with a union its employees never authorized to represent them." *Rodin,* 558 F.3d at 1033.

■■ Here, plaintiffs are not a union; they are pension fund trustees. Plaintiffs are not trying to turn Simas Floor into a union shop; they are simply trying to collect the pension fund liability which M & M incurred during its 10 years of operation. In such a situation, the second half of the alter ego doctrine focuses not on the intent in creating the alter ego employer but on whether recognizing the separateness of the two employers undermines the purposes of ERISA and the MPPAA.[9] As the First Circuit explained in *Belmont:*

> The alter ego doctrine is meant to prevent employers from evading their obligations under labor laws and collective bargaining agreements through the de-

---

8. Defendants also rely on *CMSH Co. v. Carpenters Trust Fund,* 963 F.2d 238 (9th Cir. 1992). In 1978, CMSH Framing "took over" CMSH's obligation under a collective bargaining agreement and CMSH ceased all union operations. In 1980, Congress passed the MPPAA which imposed liability on employers who withdrew from established pension plans. In 1982, CMSH framing did not renew its collective bargaining agreement and later dissolved itself and incurred withdrawal liability. The Ninth Circuit ruled that CMSH was not liable for CMSH Framing's withdrawal liability because CMSH had withdrawn from the pension fund before the pas-

sage of the MPPAA at a time when there was no withdrawal liability. The issue of retroactively imposing withdrawal liability on firms which had withdrawn from pension funds prior to the enactment of the MPPAA is not present here.

9. Unlike this case, in *Rodin* there was no evidence that the union employer used the non-union employer to avoid its union obligations or that the non-union employer benefitted from any arrangement it had with the union employer's labor force. *Rodin,* 558 F.3d at 1033–34.

vice of making " 'a mere technical change in the structure or identity of the employing entity ... without any substantial change in its ownership or management.' "

Although developed in the labor law context, alter ego or successor liability analysis has been applied to claims involving employee benefit funds brought under ERISA and the LMRA. The rationale is that "an employer who evades his pension responsibilities gains an unearned advantage in his labor activities. Moreover, underlying congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits."

In determining whether a nonsignatory employer is an alter ego of a signatory, we consider a variety of factors, including continuity of ownership, similarity of the two companies in relation to management, business purpose, operation, equipment, customers, supervision, and anti-union animus—i.e., "whether the alleged alter ego entity was created and maintained in order to avoid labor obligations." No single factor is controlling, and all need not be present to support a finding of alter ego status. In particular, there is no rule that wrongful motive is an essential element of a finding of alter ego status.

139 F.3d at 307–308 (citations omitted). More recently, the First Circuit stated that the alter ego doctrine

is not a formalistic mechanism for reflexively regarding distinct jural entities' as legally interchangeable whenever the entities' relationship is marked by a sufficient number of the doctrine's characteristic criteria .... Rather, the doctrine is a *tool* to be employed when the corporate shield, if respected would inequitably prevent a party from receiving what is otherwise due and owing from the person or persons who have created the shield.

*Massachusetts Carpenters Central Collection Agency v. A.A. Building Erectors, Inc.,* 343 F.3d 18, 21–22 (1st Cir.2003). Other circuits generally agree. "[A]lter-ego liability does not arise from any particular statutory provision at all, but rather from a general federal policy of piercing the corporate veil when necessary to protect employee benefits." *See New York State Teamsters Conference Pension & Retirement Fund v. Express Services, Inc.,* 426 F.3d 640, 647 (2d Cir.2005) (citing *Bd. of Trs. v. Foodtown, Inc.,* 296 F.3d 164, 169 (3d Cir.2002); *Lumpkin v. Envirodyne Indus., Inc.,* 933 F.2d 449, 460–61 (7th Cir.1991)). In a pension fund liability case, the focus is less whether a union or non-union employer was created for an improper purpose, and more whether disregarding their separate entities is necessary to protect employees' rights under ERISA and the MPPAA.

After reviewing the substantial undisputed evidence presented by the parties about the manner in which Simas Floor and M & M operated, I conclude that for purposes of imposing pension fund withdrawal liability, plaintiffs have established that Simas Floor and M & M were alter egos. To find otherwise would defeat the purpose of the alter ego doctrine in the ERISA and MPPAA context. It would permit M & M to evade its obligations under ERISA and the collective bargaining agreement. It would result in M & M's former employees being deprived of contributions towards their pension benefits that they earned under the collective bargaining agreement M & M signed. It would also permit Simas Floor to have gained an unearned advantage, allowing it to keep the benefits of the profits it made from M & M's union workforce without requiring it to bear the pension responsibilities that work entailed.

The evidence that most troubles the Court is the way Simas Floor controlled the cash that flowed through to M & M. Simas Floor did not deal with M & M as an arms length subcontractor; it merely provided M & M with sufficient funds to pay operating expenses and overhead. This meant that Simas Floor controlled M & M's profits, and that consequently, M & M would never have had sufficient funds to pay the withdrawal liability unless those funds were provided to it by Simas Floor. The import of this ruling is to require Simas Floor to do just that. Having benefitted for 10 years from work performed by employees protected by union collective bargaining agreements, Simas Floor should bear the burden of completing the funding of their pension entitlements.

For all the foregoing reasons, plaintiffs are **GRANTED** summary judgment against Simas Floor on the grounds that Simas Floor and M & M were alter ego employers.[10]

### DEFENDANTS' MOTION

■ For the reasons plaintiffs are granted summary judgment, defendants are **DENIED** summary judgment on their claim that Simas Floor is not an employer within the meaning of the MPPAA.[11] This leaves defendants' motion for a declaratory judgment that it is not in default under 29 U.S.C. § 1399(c)(5)(A) or (B).

Plaintiffs argue that defendants are in default under both sub-sections of section 1399 because defendants did not timely submit M & M's September 2008 withdrawal liability payment and because M & M's liabilities exceed its assets.

Section 1399(c)(5)(A) states that:

"[i]n the event of a default, a plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made ... the term "default" means ... the failure of an employer to make, when due, any payment under this section, if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure...."

29 U.S.C. § 1399(c)(5)(A). The Supreme Court has stated that:

[a] withdrawing employer's basic responsibility under the MPPAA is to make each withdrawal liability payment when due. The Act thus establishes an installment obligation. Just as a pension plan cannot sue to recover *any* withdrawal liability until the employer misses a scheduled payment, so too must the plan generally wait until the employer misses a particular payment before suing to collect that payment.

*Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.*, 522 U.S. 192, 208, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997).

Here, plaintiffs did not send written notice to defendants, as required by section 1399, of defendants' failure to pay the September 2008 quarterly liability payment. Plaintiffs' August 18, 2008 letter demanding the June 2008 payment was sent before defendants' September installment payment was even due. It did not provide defendants with written notification of the default as to the September payment. Because defendants timely cured their de-

---

10. In view of this disposition I need not reach plaintiffs' alternative grounds for liability: a violation of 29 U.S.C. § 1392(c) and successor liability.

11. Defendants also sought a ruling that it and M & M are not under "common control" within the meaning of 29 U.S.C. § 1301(b)(1). This request is **DENIED** as moot, in view of the Court's ruling and the fact that plaintiffs did not seek relief on this theory.

fault of the June 2008 payment, plaintiffs' invocation of the statutory acceleration provision was staved off. Defendants never reinvoked it by making a written demand for the September quarterly payment.

Plaintiffs assertion that defendants are in default under section 1399(c)(5)(B) is equally unavailing. Like section 1399(c)(5)(A), section 1399(c)(5)(B) permits a plan sponsor to accelerate payments upon "any other event defined in rules adopted by the plan which indicates a substantial likelihood that an employer will be unable to pay its withdrawal liability." Plaintiffs argue that under section 1399(c)(5)(B), defendants are in default because M & M's liabilities exceed its assets. Having found that defendant Simas Floor is responsible for M & M's withdrawal liability, I find that defendants' liabilities do not exceed their assets, as plaintiffs have submitted no evidence that Simas Floor is insolvent, delinquent on its current bills, or otherwise defunct in its daily operations.

Defendants' motion for summary adjudication is not in default under section 1399(c)(5)(A)-(B) is therefore **GRANTED**.

Judgment shall be entered accordingly.