**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RESILIENT FLOOR COVERING PENSION
FUND; BOARD OF TRUSTEES OF THE
RESILIENT FLOOR COVERING PENSION
PLAN,
      *Plaintiffs-counter-defendants-*
                 *Appellees,*

         v.

M&M INSTALLATION, INC., a
California corporation,
             *Defendant-Appellant,*

SIMAS FLOOR CO., INC., a
California corporation,
        *Defendant-counter-claimant-*
                 *Appellant.*

No. 09-17047

D.C. No.
3:08-cv-05561-BZ

20553

RESILIENT FLOOR COVERING PENSION
FUND; BOARD OF TRUSTEES OF THE
RESILIENT FLOOR COVERING PENSION
PLAN,
          *Plaintiffs-counter-defendants-*
                      *Appellants,*

          v.

M&M INSTALLATION, INC., a
California corporation,
                *Defendant-Appellee,*

SIMAS FLOOR CO., INC., a
California corporation,
          *Defendant-counter-claimant-*
                      *Appellee.*

No. 09-17064

D.C. No.
3:08-cv-05561-BZ

OPINION

Appeal from the United States District Court
for the Northern District of California
Bernard Zimmerman, Magistrate Judge, Presiding

Argued and Submitted
November 5, 2010—San Francisco, California

Filed December 22, 2010

Before: Arthur L. Alarcón and Pamela Ann Rymer,
Circuit Judges, and Matthew F. Kennelly, District Judge.*

Opinion by Judge Rymer

*The Honorable Matthew F. Kennelly, United States District Judge for
the Northern District of Illinois, sitting by designation.

---

**COUNSEL**

Stephen T. Davenport, Davenport Gerstner & McClure, Walnut Creek, California, for the defendants-appellants/appellees.

Katherine A. McDonough, Kraw and Kraw, Mountain View, California, for the plaintiffs-appellees/appellants.

---

**OPINION**

RYMER, Circuit Judge:

This appeal involves a "double-breasted" operation where a non-union employer, Simas Floor Co., Inc., set up a union employer, M&M Installation, Inc. to handle union flooring work. The question is whether the non-union company, Simas Floor, is liable for withdrawal liability incurred by the union company, M&M Installation, pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. §§ 1381-1453. We conclude that assuming it is possible to be responsi-

ble on an alter ego theory, the non-union company may be liable when there is commonality between the union and non-union firms and an abuse of the double-breasted structure to avoid payment of withdrawal liability. As the district court applied a different standard that focused on whether Simas Floor's actions undermined the purposes of ERISA and MPPAA, *Resilient Floor Covering Pension Fund v. M & M Installation, Inc.*, 651 F. Supp. 2d 1057 (N.D. Cal. 2009), we reverse and remand. The district court also rejected the Pension Fund's claim that it could accelerate the withdrawal payments. The Fund cross-appeals, and we affirm.

I

Simas Floor is a non-union residential and commercial flooring contractor with offices in Sacramento, Stockton, and Visalia. It is owned in equal shares by three cousins, Mark Simas, Michelle Simas Carli, and Craig Simas. Mark Simas is the president; the other two are vice-presidents. The cousins are directors along with their fathers, Ken, Jack, and Dave Simas.

M&M was formed June 1, 1994 by Mark Simas as a residential flooring and tile contractor. It was created to serve as a union signatory flooring contractor to allow non-union Simas Floor to bid on union jobs by subcontracting the work to M&M. Mark Simas is M&M's controlling shareholder and president, and a director along with Jack, Ken, and Dave Simas who each own 15% of the shares. Megan Hui was Simas Floor's chief financial officer and performed similar functions for M&M, as did Michele Carli in human resources. M&M operated out of Simas Floor's Sacramento facility, and entered into collective bargaining agreements for its flooring installers with Carpet, Resilient Flooring and Sign Workers Local Union No. 1237. These agreements required M&M to make contributions to the Resilient Floor Covering Pension Fund on behalf of M&M's flooring installers. By the time its collective bargaining agreement came up for renewal in mid-

2004, Painters District Council No. 16 had assumed control of Local 1237. The District Council insisted that the new agreement also cover Simas Floor's Sacramento flooring installers, which was not acceptable to M&M. An impasse and strike ensued, followed by a letter to Local 1237 dated July 8, 2004 from Mark Simas that repudiated the agreement for flooring installers. (This did not affect M&M's tile work or tile installers who were covered by a different collective bargaining agreement.) M&M then stopped making contributions to the Pension Fund, which prompted the Pension Fund to assess a $2,414,228.00 withdrawal liability, with quarterly payments of $43,945.20 due every March, June, September, and December for twenty years. M&M made quarterly payments from December 2004 through April 30, 2008, when it shut down operations and went out of business.

In a letter of August 19, 2008 the Pension Fund notified M&M that its June 2008 payment was delinquent and demanded payment. It explained that in its view, M&M was "still doing business under the name of either M&M Installations or Simas Floor Company" and continued to be liable for withdrawal liability. Ultimately, Simas Floor made the payments under protest. This suit, in which the Pension Fund seeks to collect the withdrawal liability from M&M and Simas Floor, and to accelerate payment, followed.

The parties filed cross-motions for summary judgment. The Pension Fund moved for judgment on the grounds that Simas Floor and M&M were alter ego employers; that M&M wound up its business with a principal purpose of avoiding its withdrawal liability in violation of § 1392(c); and that Simas Floor is the successor employer to M&M. Simas Floor sought judgment on the footing that it was not an "employer" within the meaning of MPPAA as it is not the alter ego or successor of M&M. In a published decision, the district court granted summary judgment to the Pension Fund, holding that Simas Floor was M&M's alter ego because the two companies admittedly had sufficient commonality and because recognizing the sepa-

rateness of the two would undermine the purposes of ERISA and MPPAA to protect employee rights. *Resilient Floor Covering Pension Fund v. M & M Installation, Inc.*, 651 F. Supp. 2d 1057 (N.D. Cal. 2009). The court did not reach the remaining grounds. It also granted judgment in Simas Floor's favor that a default had not occurred under 29 U.S.C. § 1399(c)(5)(A)-(B) such that the Fund was entitled to accelerate the debt.

Simas Floor appealed the judgment adverse to it, and the Pension Fund cross-appealed.

II

We have previously explained how and why MPPAA imposes withdrawal liability on union employers when they withdraw from a multiemployer pension fund. *See H.C. Elliott, Inc. v. Carpenters Pension Trust Fund for N. Cal.*, 859 F.2d 808, 809-12 (9th Cir. 1988); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 607-611 (1993). In a nutshell, ERISA, which was enacted in 1974, was intended to protect employees covered by pension plans from being deprived of anticipated benefits because of employer underfunding. When it turned out to do so inadequately, MPPAA was enacted in 1980 to reduce an employer's incentive to terminate its affiliation with a multiemployer pension plan by requiring employers who do withdraw to pay the unfunded vested benefits attributable to the withdrawing employers' participation.[1]

[1] MPPAA imposes withdrawal liability on an "employer" that withdraws from a multiemployer pension plan. 29

---

[1]Employers in the construction industry are liable only if they continue to perform work within the jurisdiction of the collective bargaining agreement and cease to have an obligation to contribute. *H.C. Elliot*, 859 F.3d at 811-12; 29 U.S.C. § 1383(b)(2). Simas Floor does not contest that it continued to perform flooring work.

U.S.C. § 1381.[2] The statute does not define "employer." While Title I of ERISA does have a definition, 29 U.S.C. § 1002(5),[3] it does not directly apply to Title IV, which contains MPPAA. Drawing on Title I's definition, however, many courts have held that the term "employer" means "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *See Korea Shipping Corp. v. N.Y. Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Trust Fund*, 880 F.2d 1531, 1537 (2d Cir. 1989); *Carriers Container Council, Inc. v. Mobile S.S. Ass'n Inc.-Int'l Longshoreman's Ass'n, AFL-CIO Pension Plan and Trust*, 896 F.2d 1330, 1343 (11th Cir. 1990); *Seaway Port Auth. of Duluth v. Duluth-Superior ILA Marine Ass'n Restated Pension Plan*, 920 F.2d 503, 507 (8th Cir. 1990); *Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 85 F.3d 1282, 1287 (7th Cir. 1996); *Cent. States, Se. and Sw. Areas Pension Fund v. Int'l Comfort Prods., LLC*, 585 F.3d 281, 284-85 (6th Cir. 2009).[4]

**[2]** There is no question that M&M was the signatory entity and Simas Floor was not. This means that M&M was the "employer" for purposes of § 1381. But both parties agree that if Simas Floor is the alter ego of M&M, then it, too, is

---

[2]Section 1381(a) provides: "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability." 29 U.S.C. § 1381(a).

[3]Section 1002(5) provides: "The term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5).

[4]We have described an employer as "one who was a signatory employer with respect to the plan," *H.C. Elliott*, 859 F.2d at 813, but in the different context of whether a company remained an employer after it stopped employing people.

an "employer" and is responsible for M&M's withdrawal liabil-
ity.[5]

**[3]** We assume, for purposes of resolving this appeal, that
this is so, that is, that the alter ego doctrine is available under
MPPAA to hold a non-union entity liable for the withdrawal
liability of a union employer. Neither the parties nor the dis-
trict court raised any question about whether alter ego liability
or veil piercing is consistent with the statute when withdrawal
liability is at issue. However, we note that § 1392(c) provides
that "[i]f a principal purpose of any transaction is to evade or
avoid liability under this part, this part shall be applied (and
liability shall be determined and collected) without regard to
such transaction." While we will decide the issue that has
been presented, we expect on remand that the court will con-
sider whether § 1392(c) is intended to be the sole route of
redress for evading or avoiding withdrawal liability.

**[4]** The dispute actually raised in this case centers on what
is the correct test for determining whether Simas Floor is
M&M's alter ego and how the Pension Fund, which bears the
burden of proof, may satisfy the test. The district court
acknowledged the two-part alter ego test from *UA Local 343
v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1470 (9th Cir.
1994), but changed it. The *Nor-Cal* alter ego test requires
proof (1) that the two firms have "common ownership, man-
agement, operations, and labor relations," and (2) that the
non-union firm is used "in a sham effort to avoid collective
bargaining obligations." *Id.* (quotations omitted). The district
court replaced the second element with one focusing on
"whether recognizing the separateness of the two employers
undermines the purposes of ERISA and the MPPAA." *M &
M Installation*, 651 F. Supp. 2d at 1062.

---

[5]The Pension Fund did not argue in district court that Simas Floor and
M&M are a "single employer" operating under "common control" for pur-
poses of § 1301(b)(1). Nor is any issue raised regarding whether ERISA
"common control" or § 1392(c) are the only ways for a company to be
responsible for another entity's withdrawal liability.

Simas Floor concedes for present purposes that the commonality element of the *Nor-Cal* test is met. Instead, it maintains that the district court incorrectly ignored Ninth Circuit precedent, beginning with *Carpenters' Local Union No. 1478 v. Stevens*, 743 F.2d 1271 (9th Cir. 1984), regarding the second element. That element has been variously phrased as "whether [the non-union employer] was created in an attempt to avoid the obligations of a [the union employer's] collective bargaining agreement through a sham transaction or a technical change in operations"; whether the non-union employer was used in a sham effort to avoid collective bargaining obligations; and whether some measure of fraud or misrepresentation exists. *Nor-Cal*, 48 F.3d at 1470, 1472 (quotations omitted). *See also A. Dariano & Sons, Inc. v. Dist. Council of Painters No. 33*, 869 F.2d 514, 519 (9th Cir. 1989) (indicating that in all alter ego determinations an element of fraud or misrepresentation also exists); *CMSH Co. v. Carpenters Trust Fund for N. Cal.*, 963 F.2d 238, 241-42 (9th Cir. 1992) (indicating that the alter ego doctrine only applies when the alter ego is formed to avoid a preexisting duty). On this point, Simas Floor maintains that it had no collective bargaining obligation and was not a signatory to a union contract in 1994 when M&M was formed, therefore M&M was not created to avoid a pre-existing collective bargaining obligation. *See S. Cal. Painters & Allied Trades Dist. Council No. 36 v. Rodin & Co.*, 558 F.3d 1028, 1032-33 (9th Cir. 2009) (rejecting a "reverse alter ago" doctrine where a non-union employer created a union-signatory employer). Nor in its view was Simas Floor used to avoid M&M's collective bargaining obligations because there is no evidence that M&M transferred tile work to Simas Floor when it closed at the end of April 2008. And Simas Floor dismisses the possibility of deception because the Pension Fund knew that it functioned through a double-breasted operation.

The Pension Fund, on the other hand, treats the issue as if it turns almost entirely on the first prong, arguing that Simas Floor exercised such dominion and control over M&M and

M&M's installers as to be their employer. It did, in the Fund's view, because there was no written agreement between Simas Floor and M&M; M&M was not an arm's length subcontractor; Simas Floor controlled M&M's work assignments; Simas Floor hired, fired, and disciplined M&M's installers; Simas Floor supervised M&M installers on site; income received by Simas Floor was used to pay M&M's pension contributions and later its withdrawal liability; and Simas Floor controlled the cash that flowed through M&M so that M&M would never have sufficient funds to meet its withdrawal liability obligations unless those funds were supplied by Simas Floor.

The Pension Fund submits that the line of authority upon which Simas relies is distinguishable because it consists of collective bargaining cases where a union or pension fund sought to extend a collective bargaining agreement to cover the employees of a related non-signatory, which the Fund is not trying to do here. Nevertheless, the Pension Fund contends that even under the standard advocated by Simas Floor, the undisputed evidence establishes that M&M and Simas Floor intended to evade M&M's withdrawal liability. It points to evidence that Mark Simas, Michelle Simas, and Megan Hui discussed shutting down M&M or reassigning it work to avoid withdrawal liability; sued their lawyer for malpractice for failing to provide an "exit strategy"; and when they lost that action, reassigned M&M's tile installation work and notified the Pension Fund it would no longer make withdrawal payments because operations had ceased. The Pension Fund posits that what really happened was that the carpet installation work in Sacramento that had been performed jointly by M&M and Simas Floor was then being performed solely by Simas Floor, but the pension contributions that were once paid on a portion of Simas Floor's carpet installation work were no longer being made.

The Pension Fund offers no authority for the proposition that it can prevail by merely showing that the non-union employer (Simas) exerted such control and dominion over the

signatory employer (M&M) and its employees as to be the employer of those employees. This is just another way of saying that the *first* element is met because of common ownership, common management, interrelation of operations, and common control of labor relations.

Likewise, neither the Fund nor the district court points to authority for a second element that would focus on "whether recognizing the separateness of the two employers undermines the purposes of ERISA and the MPPAA," as the district court held. *M & M Installation*, 651 F. Supp. 2d at 1062-63. We are not persuaded that this is a meaningful test. It basically converts a canon of statutory construction — that ERISA and MPPAA should be "liberally construed in favor of protecting participants in employee benefit plans," *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984) — into a standard for non-statutory alter ego status. Whether recognizing the separateness of a double-breasted operation would, or would not, undermine the purposes of ERISA and MPPAA is a policy consideration that informs how we construe the statutes and apply the alter ego doctrine in any particular case; it is not part of the alter ego test itself.

The *Nor-Cal* test upon which Simas Floor relies is not entirely apposite, either. It has mainly been applied in labor cases where union employers try to evade their on-going collective bargaining obligations by shifting business to a non-union employer. A successful application of the doctrine in the *Nor-Cal* model binds the non-union employer to the signatory employer's continuing collective bargaining agreement, *see Stevens*, 743 F.2d at 1276, whereas a successful application of the doctrine in this case would oblige the non-union employer to pay the signatory employer's debt.

Simas Floor also contends that we have made clear that an element of fraud or misrepresentation involving a pre-existing duty exists in all alter ego determinations. For this it points in particular to *CMSH*, where we focused on whether the alter

ego was formed to avoid a preexisting duty to make benefit fund payments. 963 F.2d at 241-42. *CMSH*, however, involves a different fact pattern and different legal issue from that presented here. There, the employer (CMSH) withdrew from a pension plan before MPPAA was passed; another company (Framing) was formed after this and assumed CMSH's obligations under the collective bargaining agreement, including the obligation to pay pension contributions into the pension fund, but then itself withdrew. Framing conceded withdrawal liability, but the fund sought to hold its predecessor, CMSH, responsible as well. *Id.* at 239. We held that CMSH was not liable because Framing replaced it as the employer and because CMSH ceased all operations prior to the effective date of MPPAA. *Id.* at 240-42. Neither situation exists in this case, and in addition, *CMSH* is distinguishable because there was no evidence of commonality or that Framing depended on CMSH for business and income. *Id.* at 239. It is not, therefore, compelling authority.

**[5]** Notwithstanding the differences, however, the rationale of our alter ego cases shows that the *Nor-Cal* standard, adapted to the circumstances of withdrawal liability, remains applicable. It is natural for a case involving the on-going obligations of a union employer to focus on whether the non-union employer should be bound by those obligations because the non-union employer was created with the purpose of avoiding those obligations. But the concern that animated development of the doctrine in *Stevens* and *Nor-Cal* exists here as well: the double-breasted operation, while not inherently illegal, can be used to avoid payment of withdrawal liability. *See, e.g., Stevens*, 743 F.2d at 1275-77; *Nor-Cal*, 48 F.3d at 1469-70. If this concern exists, then the non-union company may be responsible as an alter ego employer for the union company's withdrawal liability.

Nevertheless, Simas Floor maintains that it cannot be responsible for M&M's debt because we rejected a "reverse alter ego" theory in *Rodin*. We agree that the facts here resem-

ble the scenario that we considered in *Rodin* in that in each case, the non-union employer established a union employer. Beyond that, the cases are dissimilar. The union in *Rodin* claimed that Rodin (a non-union company) and Southern California Painting (a closely related union company Rodin was instrumental in establishing) were alter egos and that Rodin was therefore bound by the master labor agreement signed by Southern California Painting. We observed that in a traditional, *Nor-Cal* type alter ego claim, the *union* employer opens a *non-union* company to avoid *existing* collective bargaining obligations, whereas in *Rodin*, the *non-union* employer opened a *union* company allegedly to avoid *future* collective bargaining obligations. 558 F.3d at 1032. In that circumstance, it seemed nonsensical to us to hold that the non-union employer attempted to avoid union obligations by creating a union firm; there simply were no collective bargaining obligations to avoid by doing so. However, we recognized that it might be different if the union firm were to use the non-union firm to avoid the union firm's obligations, or if the union firm were subsequently to shift work to the non-union firm. *Id.* at 1033-34.

**[6]** We believe this case is different in the ways *Rodin* recognized. There is an indication that M&M and Simas Floor used Simas Floor to avoid M&M's withdrawal liability. Among other things, M&M received all of its contracts and income from Simas Floor, and passed profits through to Simas Floor rather than itself making a profit. One of the reasons for the failure of M&M to make withdrawal liability payments may be that it lacked either the income or capital to do so. *See Labor Clean-up Contract Admin. Trust Fund v. Uriarte Clean-up Serv., Inc.*, 736 F.2d 516, 524-25 (9th Cir. 1984) (inferring fraudulent intent by incorporators due to the lack of capitalization for purposes of piercing the corporate veil to recover unpaid trust fund benefits). Of course another reason may be that M&M ran out of business in a down-economy, as Simas Floor argues. But there is evidence that,

if accepted, would make this case an exception to the *Rodin* rule.

**[7]** Because the district court applied a different standard, we believe that, if it concludes alter ego liability is available, it should consider the evidence in light of the appropriate standard in the first instance. In that event, given the different standard, the court will need to revisit whether a triable issue of fact exists on the second element. We decline to reach Simas Floor's liability under § 1392(c) because the district court did not reach it; but we encourage consideration of this claim on remand, as well as whether §§ 1301(b)(1) and 1392(c) are the sole means for recovery of withdrawal liability from companies related to the union signatory.[6]

### III

The Pension Fund contends that it is entitled to accelerate the withdrawal liability because Simas Floor failed to make a payment upon demand and created a substantial likelihood that it would not pay when it repudiated the obligation. Under MPPAA, withdrawal liability may be accelerated if "the failure [to pay] is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure." 29 U.S.C. § 1399(c)(5)(A). The Fund sent Simas Floor a late notice dated August 19, 2008 for the June 2008 payment, which Simas Floor received on September 8. It cured the default within 60 days by paying on November 6, 2008.

---

[6]The district court denied as moot Simas Floor's request for a summary declaration that M&M and it were not under "common control" for purposes of § 1301(b)(1). Given our disposition, the issue will not be moot on remand. However, we understand that the Pension Fund did not contest this ground of Simas Floor's motion for summary judgment in the district court and makes no argument with respect to it on appeal. That being the case, declaratory relief would be appropriate on remand.

The Pension Fund maintains that its August 19 letter was also a demand for the September 2008 payment because it addressed repudiation of M&M's obligation to make future payments. However, this position is foreclosed by the plain language of the statute, which provides that "the *failure* of an employer to make, *when due*, any payment . . . if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of *such failure*." 29 U.S.C. § 1399(c)(5)(A) (emphasis added).

**[8]** We decline to reach the Fund's anticipatory repudiation argument, as it was not raised in district court.

IV

**[9]** We affirm the summary judgment in Simas Floor's favor that the Pension Fund was not entitled to accelerate the debt for withdrawal liability under § 1399(c)(5). We reverse the summary judgment in the Pension Fund's favor that Simas Floor is liable for M&M's withdrawal liability on the ground they were alter ego employers, and remand for the parties and court to revisit the issue under the appropriate standard. We decline to reach remaining issues before they are addressed in the first instance by the district court.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.[7]

---

[7]The parties are to bear their own costs.